UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
MANHATTAN DIVISION

IN RE

BOBBY H.J. KIM AKA BOBBY H. KIM,
AKA TITAN REAL ESTATE CAPITAL LLC,
AKA STAR BOUND INC.

DEBTOR

CHAPTER 13

CASE NO. 20-10149-cgm

CHIEF JUDGE: Cecelia G. Morris

MOTION DATE:  July 9, 2020

MOTION TIME: 9:00 A.M.

**PLEASE TAKE NOTICE** that upon the annexed affirmation of Shari S. Barak, a member of the law firm of Shapiro, DiCaro & Barak, LLC, attorneys for Select Portfolio Servicing, Inc. as Servicer for U.S. Bank National Association (successor to Bank of America, N.A., successor by merger to LaSalle Bank N.A.), as Indenture Trustee, on behalf of the holders of the Thornburg Mortgage Securities Trust 2007-2 Mortgage-Backed Notes, Series 2007-2 ("Movant") will move this Court as set forth below:

JUDGE:                               HON.  Cecelia G. Morris


RETURN DATE & TIME:      July 9, 2020 at 9:00 A.M.


COURTHOUSE:                     United States Bankruptcy Court
                                           Alexander Hamilton Custom House
                                           One Bowling Green
                                           New York, NY 10004

RELIEF REQUESTED:         The proposed order will seek to vacate the automatic stay imposed by 11 U.S.C. § 362(a) generally described as 130 Beekman Street #5B, New York, NY 10038, pursuant to 11 U.S.C. § 362(d)(1) based upon the total debt due to Movant, resulting in Movant's lack of adequate protection or, pursuant to 11 U.S.C. § 362(d)(2), inasmuch as the estate has no equity in the aforementioned property with regard to the subject property.

**PLEASE TAKE FURTHER NOTICE,** that answering affidavits, if any, to the relief requested, must be served upon and received by Shapiro, DiCaro & Barak, LLC at their offices at One Huntington Quadrangle, Suite 3N05, Melville, NY 11747 and filed with the Clerk of the United States Bankruptcy Court for the Southern District of New York at United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, NY 10004 no later than seven (7) days prior to the return date of this motion.

Dated: _____June 2_____, 2020
    Melville, New York

/s/Shari Barak
_____
Shari S. Barak
Managing Attorney
Shapiro, DiCaro & Barak, LLC
Attorneys for Select Portfolio Servicing, Inc. as
Servicer for U.S. Bank National Association
(successor to Bank of America, N.A., successor by
merger to LaSalle Bank N.A.), as Indenture Trustee,
on behalf of the holders of the Thornburg Mortgage
Securities Trust 2007-2 Mortgage-Backed Notes,
Series 2007-2
One Huntington Quadrangle, Suite 3N05
Melville, NY  11747
Telephone: (631) 844-9611
Fax: (631) 844-9525

**THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.  THIS NOTICE IS REQUIRED BY THE PROVISIONS OF THE FAIR DEBT COLLECTIONS PRACTICES ACT AND DOES NOT IMPLY THAT WE ARE ATTEMPTING TO COLLECT MONEY FROM ANYONE WHO HAS DISCHARGED THE DEBT UNDER THE BANKRUPTCY LAWS OF THE UNITED STATES.**

TO:  SERVICE LIST

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
MANHATTAN DIVISION

IN RE

BOBBY H.J. KIM AKA BOBBY H. KIM,
AKA TITAN REAL ESTATE CAPITAL LLC,
AKA STAR BOUND INC.

DEBTOR

CHAPTER 13

CASE NO. 20-10149-cgm

CHIEF JUDGE: Cecelia G. Morris

MOTION DATE:  July 9, 2020

MOTION TIME: 9:00 A.M.

**AFFIRMATION IN SUPPORT OF
ENTRY OF AN ORDER GRANTING
RELIEF FROM THE AUTOMATIC STAY**

Shari S. Barak, an attorney at law duly admitted to practice before the Courts of the State
of New York and the U.S. District Court for the Southern District of New York, hereby affirms
the following to be true under penalty of perjury:

1.   I am a member with the law firm of Shapiro, DiCaro & Barak, LLC, attorneys for Select
Portfolio Servicing, Inc. as Servicer for U.S. Bank National Association (successor to Bank of
America, N.A., successor by merger to LaSalle Bank N.A.), as Indenture Trustee, on behalf of the
holders of the Thornburg Mortgage Securities Trust 2007-2 Mortgage-Backed Notes, Series 2007-
2 ("Movant"), a secured creditor of Bobby H.J. Kim aka Bobby H. Kim, aka Titan Real Estate
Capital LLC, aka Star Bound Inc. ("Debtor").  As such, I am fully familiar with the facts and
circumstances of this case.

2.   I make this Affirmation in support of the within request for an Order Granting Relief
from the automatic stay, for cause, pursuant to 11 U.S.C. § 362(d)(1) based upon Debtor's post-
petition default, resulting in Movant's lack of adequate protection.

3. Jurisdiction is conferred on this Court by the provisions of 28 U.S.C. § 1334. This is a proceeding to terminate and annul the automatic stay and is therefore a "core" proceeding within the meaning of 28 U.S.C. § 157(b)(2).

4. Movant is a Secured Creditor of Debtor pursuant to a Consolidation Extension Modification Agreement ("Consolidation Agreement") executed by Debtor on February 21, 2007, whereby Bobby H.J. Kim promised to repay the principal amount of $1,575,000.00 plus interest to Thornburg Mortgage Home Loans, Inc., A Delaware Corporation (the "Consolidated Note"). To secure the repayment of the Consolidated Note, Bobby H.J. Kim granted Mortgage Electronic Registration Systems, Inc., as nominee for Thornburg Mortgage Home Loans, Inc. a mortgage, which was duly recorded as part of the Consolidation Agreement in the Office of the City Register of the City of New York on March 6, 2007 at CRFN 2007000120983 (the "Consolidated Mortgage", the Consolidation Agreement, Consolidated Note and Consolidated Mortgage, collectively, as the "Loan"), encumbering real property located at 130 Beekman Street #5B, New York, NY 10038 (the "Property"). The Loan was assigned to U.S. Bank National Association (successor to Bank of America, N.A., successor by merger to LaSalle Bank N.A.), as Indenture Trustee, on behalf of the holders of the Thornburg Mortgage Securities Trust 2007-2 Mortgage-Backed Notes, Series 2007-2 as memorialized by instrument dated August 22, 2012 and recorded on September 6, 2012 at CRFN 2012000351747 (the "Assignment of Mortgage"). The terms of the Loan were modified by agreement beginning May 1, 2009 entered into by and between Thornburg Mortgage Home Loans, Inc., and Bobby H.J. Kim creating a new principal balance in the amount of $1,583,167.78 (the "Loan Modification Agreement"). A copy of the Consolidation Agreement, including the Consolidated Note and Consolidated Mortgage, Assignment of Mortgage and Loan Modification Agreement are annexed hereto as **Exhibit "A"**.

5. Upon information and belief, the Debtor herein own(s) the Property.

6. Debtor filed a petition for relief under Chapter 13 of the U.S. Bankruptcy Code on or about January 22, 2020.

7. The Mortgage was in default on the day the Debtor filed this bankruptcy. Based upon said default, Movant initiated foreclosure proceedings in the Supreme Court of the State of New York, County of New York, under index number 810144/2012. Judgment of Foreclosure & Sale ("JFS") was entered June 22, 2018. Foreclosure sale was duly advertised in accordance with said judgment, with a sale date scheduled for January 22, 2020. The filing of the instant bankruptcy stayed said sale. Annexed hereto as **Exhibit "B"** are copies of the Judgment of Foreclosure & Sale and Notice of Sale.

8. Debtor has failed to make mortgage payments due to Movant under the terms of the Loan. As a result, the Mortgage remains due post-petition for the February 1, 2020 payment and each subsequent payment thereafter.

9. The amount of delinquency due as of April 17, 2020 under the Mortgage is as follows:

| | |
|---|---:|
| 2 Defaulted Monthly Payments at $11,998.75 each (February 2020 through March 2020) | $23,997.50 |
| 1 Defaulted Monthly Payments at $12,180.57 each (April 2020 through April 2020) | $12,180.57 |
| Total Delinquencies | $36,178.07 |

10. A copy of the Relief from Stay-Real Estate and Cooperative Apartments ("Affidavit") is annexed hereto as **Exhibit "C"**.

11. Accordingly, the Debtor's failure to make any post-petition payments is sufficient cause to terminate the automatic stay with respect to the Movant's interest in the Property. See In re *Schuessler,* 386 B.R. 458, 481 (Bankr. S.D.N.Y. 2008) (noting that it is well established that failure to make mortgage payments constitutes cause for relief from the automatic stay and "is one of the

best examples of a lack of adequate protection under § 362 (d)(1)"); In re *Uvaydov*, 354 B.R. 620, 624 (Bankr. E.D.N.Y. 2006) ("it is well established under decisional law that a debtor's failure to make post-petition mortgage payments in bankruptcy rehabilitation proceedings can constitute cause for relief under § 362(d)(1).").

12. Moreover, in view of the total debt due to Movant and in light of the Debtor's failure to make post-petition payments, Movant is no longer adequately protected. The automatic stay must be vacated for cause pursuant to 11 U.S.C. § 362(d)(1).

13. As set forth in the Affidavit, as of April 17, 2020, the approximate debt due and owing to Movant equals $2,574,645.76. The debt is accruing interest at a rate of 3.875% per annum.

14. Based upon the Broker's price opinion (BPO) dated March 19, 2020, the Property has an estimated fair value of approximately $1,900,000.00. A copy of the BPO is annexed hereto as **Exhibit "D"**. As indicated in paragraph 13 herein above, the total debt to Movant equals $2,574,645.76. As such, there is no dispute that the debt due to the Movant exceeds the value of the Property. The estate has no equity in the Property sought to be foreclosed. Accordingly, relief from the automatic stay is also warranted under 11 U.S.C. § 362(d)(2).

15. The Debtor, the Chapter 13 Trustee and the Office of the United States Trustee have each been duly served with the within Notice of Motion, Affirmation, Exhibits and proposed Order Vacating Stay, as more fully set forth in the annexed affidavit of mailing.

16. Upon the entry of the Order Granting Relief, the unpaid portion of claim number 7, filed by Movant, shall be deemed withdrawn.

17. No prior application has been made for the relief requested herein.

18. The entity which has the right to foreclose is: U.S. Bank National Association (successor to Bank of America, N.A., successor by merger to LaSalle Bank N.A.), as Indenture

Trustee, on behalf of the holders of the Thornburg Mortgage Securities Trust 2007-2 Mortgage-Backed Notes, Series 2007-2 by virtue of being the holder and owner of the note.

**WHEREFORE,** Movant respectfully requests an Order of this Court vacating the automatic stay for cause pursuant to 11 U.S.C. § 362(d)(1) and (2) as to the aforementioned Property; allowing Movant, its agents, assigns or successors in interest, leave to exercise its rights pursuant to the Note and Mortgage including but not limited to foreclose the Mortgage secured by the subject Property; and for such other, further and different relief as to this Court may seem just, proper and equitable.

Dated: _____June 2_____, 2020
          Melville, New York

                                        /s/Shari Barak
                                        _____
                                        Shari S. Barak
                                        Managing Attorney
                                        Shapiro, DiCaro & Barak, LLC
                                        Attorneys for Select Portfolio Servicing, Inc. as
                                        Servicer for U.S. Bank National Association
                                        (successor to Bank of America, N.A., successor by
                                        merger to LaSalle Bank N.A.), as Indenture Trustee,
                                        on behalf of the holders of the Thornburg Mortgage
                                        Securities Trust 2007-2 Mortgage-Backed Notes,
                                        Series 2007-2
                                        One Huntington Quadrangle, Suite 3N05
                                        Melville, NY  11747
                                        Telephone: (631) 844-9611
                                        Fax: (631) 844-9525

**SHAPIRO, DICARO & BARAK, LLC**
Attorneys for Select Portfolio Servicing, Inc. as Servicer
for U.S. Bank National Association (successor to Bank of
America, N.A., successor by merger to LaSalle Bank
N.A.), as Indenture Trustee, on behalf of the holders of the
Thornburg Mortgage Securities Trust 2007-2 Mortgage-
Backed Notes, Series 2007-2
One Huntington Quadrangle, Suite 3N05
Melville, NY 11747
Telephone: (631) 844-9611, Fax: (631) 844-9525
**Shari S. Barak**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
MANHATTAN DIVISION

| | |
|---|---|
| IN RE | CHAPTER 13 |
| BOBBY H.J. KIM AKA BOBBY H. KIM, AKA TITAN REAL ESTATE CAPITAL LLC, AKA STAR BOUND INC. | CASE NO. 20-10149-cgm |
| | CHIEF JUDGE: Cecelia G. Morris |
| | MOTION DATE: Jul 9, 2020 |
| DEBTOR | MOTION TIME: 9:00 A.M. |

## <u>AFFIDAVIT OF SERVICE BY MAIL</u>

I, Michael Chatwin, say, I am not a party to this action; I am over 18 years of age, I

reside in Rochester, New York.

On   June 2  , 2020 I served the within Notice of Motion, Affirmation in Support,

Exhibits and Proposed Order Granting Relief from the Automatic Stay upon:

  TO:    Debtor Appearing Pro Se
           Bobby H.J. Kim
           130 Beekman Street
           #5B
           New York, NY 10038

Trustee
Krista M. Preuss
Chapter 13 Standing Trustee
399 Knollwood Road
White Plains, NY 10603

U.S. Trustee
U.S. Federal Office Building
201 Varick Street, Suite 1006
New York, NY 10014

at the addresses designated by the foregoing individuals for that purpose by depositing a true copy

of same enclosed in a postpaid, properly addressed wrapper, in an official depository under the

exclusive care and custody of the United States Postal Service within the State of New York.

I certify under penalty of perjury the foregoing is true and correct.

Date ___June 2, 2020___

/s/ Michael Chatwin

Michael Chatwin
Bankruptcy Attorney
Shapiro, DiCaro & Barak, LLC
Attorneys for Select Portfolio Servicing, Inc.
as Servicer for U.S. Bank National
Association (successor to Bank of America,
N.A., successor by merger to LaSalle Bank
N.A.), as Indenture Trustee, on behalf of the
holders of the Thornburg Mortgage
Securities Trust 2007-2 Mortgage-Backed
Notes, Series 2007-2
175 Mile Crossing Boulevard
Rochester, New York 14624
Telephone: (585) 247-9000
Fax: (585) 247-7380

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
MANHATTAN DIVISION

IN RE

BOBBY H.J. KIM AKA BOBBY H. KIM,
AKA TITAN REAL ESTATE CAPITAL LLC,
AKA STAR BOUND INC.

DEBTOR

CHAPTER 13

CASE NO. 20-10149-cgm

CHIEF JUDGE: Cecelia G. Morris

MOTION DATE:  July 9, 2020

MOTION TIME: 9:00 A.M.

### ORDER GRANTING RELIEF FROM
### THE AUTOMATIC STAY

**UPON** consideration of the Application of Select Portfolio Servicing, Inc. as Servicer for

U.S. Bank National Association (successor to Bank of America, N.A., successor by merger to

LaSalle Bank N.A.), as Indenture Trustee, on behalf of the holders of the Thornburg Mortgage Se

curities Trust 2007-2 Mortgage-Backed Notes, Series 2007-2, ("Movant") dated June 1, 2020,

and it appearing that neither the Debtor nor the Chapter 13 Trustee nor the U.S. Trustee

have opposition to the motion brought by Movant, for relief from the automatic stay, and with

good cause appearing therefore, it is

**ORDERED** that the automatic stay, heretofore in effect pursuant to 11 U.S.C. § 362(a),

is hereby vacated for cause pursuant to 11 U.S.C. § 362(d) as to Movant, its agents, assigns or

successors in interest , so that Movant, its agents, assigns or successors in interest, may take any

and all actions pursuant to the Note and Mortgage and applicable state law including but not

limited to foreclose its mortgage on premises known as 130 Beekman Street #5B, New York,

NY 10038 without further application to this Court, and it is further

**ORDERED** that in the event this case is converted to a case under any other chapter of the

U.S. Bankruptcy Code, this Order will remain in full force and effect; and it is further

**ORDERED** upon the entry of the Order Granting Relief, the unpaid portion of claim number 7, filed by Movant, shall be deemed withdrawn; and it is further

**ORDERED** that unless specifically provided in loan documents signed by the debtor, the Movant may not collect fees, expenses or other charges associated with a current or subsequent mortgage servicer; and it is further

**ORDERED** that the Movant shall promptly report and turn over to the Chapter 13 Trustee any surplus monies realized by any sale of the Property.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
MANHATTAN DIVISION
 IN RE

BOBBY H.J. KIM AKA BOBBY H. KIM,
AKA TITAN REAL ESTATE CAPITAL LLC,
AKA STAR BOUND INC.

DEBTOR

CHAPTER 13

CASE NO. 20-10149-cgm

CHIEF JUDGE: Cecelia G. Morris

MOTION DATE:  July 9, 2020

MOTION TIME: 9:00 A.M.

## **FRCP 55 AFFIDAVIT**

I, Shari S. Barak, attorney for the Movant in the above-captioned case, represents as

follows:

1.      In accordance with the Servicemembers Civil Relief Act of 2003, I have

confirmed that the Debtor is not in the military service.

2.     After reasonable investigation and inquiry, the Debtor is not an infant or

incompetent person.


Dated:     _____June 2_____, 2020
            Melville, New York


                                          _/s/Shari Barak_____
                                          Shari S. Barak
                                          Managing Attorney
                                          Shapiro, DiCaro & Barak, LLC
                                          Attorneys for Select Portfolio Servicing, Inc. as
                                          Servicer for U.S. Bank National Association
                                          (successor to Bank of America, N.A., successor by
                                          merger to LaSalle Bank N.A.), as Indenture Trustee,
                                          on behalf of the holders of the Thornburg Mortgage
                                          Securities Trust 2007-2 Mortgage-Backed Notes,
                                          Series 2007-2
                                          One Huntington Quadrangle, Suite 3N05
                                          Melville, NY  11747
                                          Telephone: (631) 844-9611
                                          Fax: (631) 844-9525

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
MANHATTAN DIVISION
 IN RE

BOBBY H.J. KIM AKA BOBBY H. KIM,
AKA TITAN REAL ESTATE CAPITAL LLC,
AKA STAR BOUND INC.

DEBTOR

CHAPTER 13

CASE NO. 20-10149-cgm

CHIEF JUDGE: Cecelia G. Morris

MOTION DATE:  July 9, 2020

MOTION TIME: 9:00 A.M.

MEMORANDUM OF LAW IN SUPPORT
OF MOVANT'S MOTION FOR RELIEF FROM AUTOMATIC STAY

Dated: _____June 2_____, 2020
      Melville, New York

## POINT 1

This Movant is entitled to relief from the automatic stay as requested in the within motion.

The Movant has filed a motion for relief from the automatic stay with respect to the real property known as 130 Beekman Street #5B, New York, NY 10038.

11 U.S.C. §§ 362(d)(1) and (2) provide as follows:

(d)     On request of a party in interest and after notice and a hearing, the Court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay-

(1)     for cause, including the lack of adequate protection of an interest in the Property of such party in interest;

(2)     with respect to a stay of an act against property under subsection (a) of this section, if-

(A)     the Debtor does not have any equity in such property;

(B)     such property is not necessary to an effective reorganization.

Section 362(d) is mandatory, not permissive.  The Court shall grant relief from the stay for any of the reasons stated in the three subsections.  In re *Elmira Litho, Inc.,* 174 B.R. 892, 900 (Bankr S.D.N.Y. 1994); In re *Touloumis*, 170 B.R. 825, 827 (Bankr. S.D.N.Y. 1994); In re *Kleinman*, 156 B.R. 131, 136 (Bankr. S.D.N.Y. 1993); In re *Diplomat Electronics Corp.*, 82 B.R. 688, 692 (Bankr. S.D.N.Y. 1988).

Further, if any of the grounds for relief from stay apply the Court must grant the relief from stay.

Under 11 U.S.C. § 362(d)(1) relief may be granted for cause if the Debtor has failed to provide the secured creditor with adequate protection for its interest in the Property. The Debtor has breached their obligation under the Mortgage by failing to pay the installments due on February 1, 2020 and for each month thereafter. Movant has commenced an action to foreclose its mortgage in State Court. The foreclosure action is stayed by the instant bankruptcy filing.

Due to the Debtor's default in payment, relief from the automatic stay should be granted under 11 U.S.C. § 362(d)(1). See, In re *Kornhauser*, 184 B.R. 425 428 (Bankr. S.D.N.Y. 1995); In re *Kennedy*, 79 B.R. 950, 952 (Bankr. M.D.Ga. 1987); In re *R&H Investment Co.*, Inc., 46 B.R. 114, 118 (Bankr. D. Conn. 1985).

Further, there is no equity in the property, and the real property is not necessary to an effective reorganization of the Debtor. As such, relief under 11 U.S.C. § 362(d)(2) is also warranted, as more fully set forth in the motion.

In conclusion, Movant requests that this Court grant its motion for relief from the automatic stay with respect to the real property as described in the motion.

Dated: _____June 2_____, 2020
        Melville, New York

/s/Shari Barak
—————————————————————
Shari S. Barak
Managing Attorney
Shapiro, DiCaro & Barak, LLC
Attorneys for Select Portfolio Servicing, Inc. as
Servicer for U.S. Bank National Association
(successor to Bank of America, N.A., successor by
merger to LaSalle Bank N.A.), as Indenture Trustee,
on behalf of the holders of the Thornburg Mortgage
Securities Trust 2007-2 Mortgage-Backed Notes,
Series 2007-2
One Huntington Quadrangle, Suite 3N05
Melville, NY  11747
Telephone: (631) 844-9611
Fax: (631) 844-9525



# Shapiro, DiCaro & Barak, LLC

Attorneys at Law

One Huntington Quadrangle, Suite 3N05
Melville, New York 11747
Tel: (631) 844-9611 • Fax: (631) 844-9525

**Partners:**
Gerald M. Shapiro (admitted in FL, IL)
David S. Kreisman (admitted in IL)

**Managing Partners:**
John A. DiCaro (NY)
Shari S. Barak (NY)

June 1, 2020

Chambers Hon. Cecelia G. Morris
United States Bankruptcy Court
Alexander Hamilton Custom House
One Bowling Green
New York, NY 10004

In Re:  Bobby H.J. Kim
        Case No.:  20-10149-cgm     Chapter 13
        Our file:  12-019290

Dear Judge Morris:

Please be advised that a Motion for Relief from Stay was filed on behalf of Select Portfolio Servicing, Inc. as servicer for U.S. Bank National Association (successor to Bank of America, N.A., successor by merger to LaSalle Bank N.A.), as Indenture Trustee, on behalf of the holders of the Thornburg Mortgage Securities Trust 2007-2 Mortgage-Backed Notes, Series 2007-2 ("Movant") in the above captioned bankruptcy case on June 1, 2020.  The hearing on the Motion is scheduled for July 9, 2020 at 9:00 A.M..  Movant specifically waives the requirements of Bankruptcy Code 362(e).

Should you have any questions concerning the foregoing, please do not hesitate to contact the undersigned.

Very truly yours,

SHAPIRO, DICARO & BARAK, LLC


by:      /s/Shari Barak_____
        Shari S. Barak, Esq.

        cc:

**Additional Office Location:**
175 Mile Crossing Boulevard, Rochester, New York 14624 | Tel: (585) 247-9000 | Fax: (585) 247-7380

www.LOGS.com/shapiro_dicaro_barak

# Exhibit "A"

ATTORNEY'S CERTIFICATION

Pursuant to Section 2105 of the New York Civil Practice Law and Rules, I, an attorney admitted to practice in the courts of the State, hereby certify that this copy has been compared by me with the original and is a true and complete copy thereof.

ATTORNEY

This Note amends and restates in their entirety, and is given in substitution for, the Notes described in EXHIBIT A of the New York Consolidation, Extension and Modification Agreement dated the same date as this Note.

Loan No.

# INTEREST-ONLY PERIOD ADJUSTABLE RATE NOTE
### (One-Year LIBOR Index (As Published In *The Wall Street Journal*)
### Rate Caps - 10 Year Interest Only Period)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

MIN:
MERS TELEPHONE: (888) 679-6377

February 21, 2007
[Date]

NEW YORK
[City]

NEW YORK
[State]

130 BEEKMAN STREET #5B, NEW YORK, NEW YORK 10038
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 1,575,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **Thornburg Mortgage Home Loans, Inc, A Delaware Corporation**. I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **6.250%**. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will make a payment on the **FIRST** day of every month, beginning on **April 1, 2007**. Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.

I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on **March 1, 2037**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **Central Loan Admin & Reporting, P O Box 986, Newark, NEW JERSEY 01718-0597**, or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ 8,203.13 until the first Change Date. After the first Change Date, my monthly payment will be in an amount sufficient to pay accrued interest, at the rate determined as described in Section 4 of this Note until the First Principal and Interest Payment Due Date. On that date and thereafter, my monthly payment will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of changes in monthly payment.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

MULTISTATE INTEREST-ONLY PERIOD ADJUSTABLE RATE NOTE - ONE-YEAR LIBOR INDEX - 10 Year Interest Only Period - Single Family - Fannie Mae Uniform Instrument

Form 3537 6/05 (rev. 9/06)
Page 1 of 4
Initials: ____

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the **FIRST** day of **March, 2014**, and the adjustable interest rate I will pay may change on that day every 12th month thereafter.

The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **One and Seven-Eighths** percentage points (**1.875%**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of my monthly payment. For payment adjustments occurring before the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay all accrued interest each month on the unpaid principal balance at the new interest rate. If I make a voluntary payment of principal before the First Principal and Interest Payment Due Date, my payment amount for subsequent payments will be reduced to the amount necessary to repay all accrued interest on the reduced principal balance at the current interest rate. For payment adjustments occurring on or after the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay unpaid principal and interest that I am expected to owe in full on the Maturity Date at the current interest rate in substantially equal payments.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **11.250%** or less than **1.875%**. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage point(s) (2.000%) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than **11.250%**.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be that date which is the 10th anniversary date of the first payment due date, as reflected in Section 3(A) of the Note.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that

MULTISTATE INTEREST-ONLY PERIOD ADJUSTABLE RATE NOTE - ONE-YEAR LIBOR INDEX –
10 Year Interest Only Period - Single Family - Fannie Mae Uniform Instrument

Form 3537 6/05 (rev. 9/06)
Page 2 of 4

Initials: _____

exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 2.00% of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not

MULTISTATE INTEREST-ONLY PERIOD ADJUSTABLE RATE NOTE - ONE-YEAR LIBOR INDEX –
10 Year Interest Only Period - Single Family - Fannie Mae Uniform Instrument

Form 3537 6/05 (rev. 9/06)

Page 3 of 4

Initials: _____

exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
Bobby H. J. Kim                -Borrower

_____ (Seal)
                                           -Borrower

_____ (Seal)
                                           -Borrower

_____ (Seal)
                                           -Borrower

*[Sign Original Only]*

Pay To The Order of

Without Recourse

By:

PAY TO THE ORDER OF
See attachment**
WITHOUT RECOURSE
Thornburg Mortgage Home Loans, Inc.
By_____
LaSalle Bank N.A.
As Custodian, as Attorney in Fact on behalf
Of Thornburg Mortgage Home Loans, Inc.

Kelly Crunican
Assistant Vice President

**MULTISTATE INTEREST-ONLY PERIOD ADJUSTABLE RATE NOTE - ONE-YEAR LIBOR INDEX –**
10 Year Interest Only Period - Single Family - Fannie Mae Uniform Instrument

Form 3537 6/05 (rev. 9/06)
Page 4 of 4

 

** Attachment:  Bank of America N.A. (successor to LaSalle Bank N.A.), as Indenture Trustee, on behalf of the holders of the Thornburg Mortgage Securities Trust 2007-2 Mortgage-Backed Notes, Series 2007-2

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



| **RECORDING AND ENDORSEMENT COVER PAGE** | | **PAGE 1 OF 42** |
|---|---|---|
| Document ID: ▮▮▮▮▮▮ | Document Date: 02-21-2007 | Preparation Date: 02-27-2007 |
| Document Type: AGREEMENT | | |
| Document Page Count: 40 | | |

| PRESENTER: | RETURN TO: |
|---|---|
| COMMONWEALTH/LAWYERS TITLE | THORNBURG MORTGAGE HOME LOANS, INC. |
| 2 GRAND CENTRAL TOWER | 3101TECHNOLOGY DRIVE |
| 140 EAST 45TH STREET, 22ND FLOOR | EDMOND, OK 73013 |
| NEW YORK, NY 10017 | |
| 212-949-0100 | |

### PROPERTY DATA

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 97 | 1118 | Entire Lot | 5B | 130 BEEKMAN STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

### CROSS REFERENCE DATA

x Additional Cross References on Continuation Page

### PARTIES

| PARTY 1: | PARTY 2: |
|---|---|
| BOBBY H.J. KIM | MERS |
| 130 BEEKMAN STREET, #5B | PO BOX 2026 |
| NEW YORK, NY 10038 | FLINT, MI 48501 |

### FEES AND TAXES

| Mortgage | | | Filing Fee: | |
|---|---|---|---|---|
| Mortgage Amount: | $ | 229,819.15 | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | |
| Exemption: | 255 | | $ | 0.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 0.00 | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 0.00 | | |
| MTA: | $ | 0.00 | | |
| NYCTA: | $ | 0.00 | | |
| Additional MRT: | $ | 0.00 | | |
| TOTAL: | $ | 0.00 | | |
| Recording Fee: | $ | 237.00 | | |
| Affidavit Fee: | $ | 8.00 | | |

**RECORDED OR FILED IN THE OFFICE OF THE CITY REGISTER OF THE CITY OF NEW YORK**

Recorded/Filed 03-06-2007 14:03
City Register File No.(CRFN):
**2007000120983**

*Annette M. Hill*

*City Register Official Signature*

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

Document Date: 02-21-2007 | Preparation Date: 02-27-2007

Document Type: AGREEMENT

**CROSS REFERENCE DATA**
MANHATTAN **Year:** 2002    **Reel:** 3459    **Page:** 1756
**CRFN:** 2006000161982

Record and Return to:
Thornburg Mortgage, Inc.
3101 Technology Drive
Edmond, Oklahoma 73013
    Attn: Shipping Dept./Doc. Cont
Prepared by:
Abrams Garfinkel Margolis Bergson, LLP
237 West 35th Street, 4th Floor
New York, NY 10001

Section : 1
Block   : 97
Lot     : 1118
Borough of Manhattan
County of New York
State of New York

_____ Space Above This Line for Recording Data _____

# CONSOLIDATION, EXTENSION AND MODIFICATION AGREEMENT

## WORDS USED OFTEN IN THIS DOCUMENT

(A)    **"Agreement."**  This document, which is dated **February 21, 2007**, and exhibits and riders attached to this document will be called the "Agreement."

(B)    **"Borrower."  Bobby H.J. Kim** will be called "Borrower" and sometimes "I" or "me."  Borrower's address is: **130 Beekman Street, 5B New York, NY 10038**.

(C)    **"Lender."  Thornburg Mortgage Home Loans, Inc.** will be called "Lender" and sometimes "Note Holder."  Lender is a corporation or association which exists under the laws of the State of **DELAWARE**.  Lender's address is **Central Loan Admin & Reporting, P.O. Box 986, Newark, New Jersey 01718-0597**.

(D)    **"Mortgages."**  The mortgages, deeds of trust or other security instruments and any additional security instruments and related agreements (such as assignments, extensions, modifications or consolidations of mortgages) identified in Exhibit A to this Agreement will be called the "Mortgages".

(E)    *"MERS" is Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  MERS is organized and existing under the laws of Delaware, and has an address and telephone number of 4318 Miller Road, Flint, MI 48501-2026, tel. (888) 679-MERS.  FOR PURPOSES OF RECORDING THIS AGREEMENT, MERS IS THE MORTGAGEE OF RECORD.*

(F)    **"Note Holder."**  Lender or anyone who succeeds to Lender's rights under this Agreement and who is entitled to receive the payments I agree to make under this Agreement may be called the "Note Holder."

(G)    **"Notes."**  The Notes which are identified in Exhibit A to this Agreement, and which are secured by the Mortgages, will be called the "Notes".

(H)    **"Property."**  The property which is described in the Mortgage(s) and in Exhibit B to this Agreement (Legal Description), will be called the "Property."  The Property is located at:

**130 Beekman Street # 5B**
[street]
**New York,    NY 10038            New York**
[city]    [state & zip code]    [county]

I promise and I agree with Lender as follows:

## I.    BORROWER'S AGREEMENT ABOUT OBLIGATION UNDER THE NOTES AND MORTGAGES

I agree to take over all of the obligations under the Notes and Mortgages as consolidated and modified by this Agreement as Borrower.  This means that I will keep all of the promises and agreements made in the Notes and Mortgages even if some other person made those promises and agreements before me.  The total unpaid principal balance of the Notes is U.S. **$1,575,000.00**.  Of this amount, U.S. **$229,819.15** was advanced to me (or for my account) immediately prior to this consolidation.

## II.    AGREEMENT TO COMBINE NOTES AND MORTGAGES

(A)    By signing this Agreement, Lender and I are combining into one set of rights and obligations all of the promises and agreements stated in the Notes and Mortgages including any earlier agreements which combined, modified, or extended rights and obligations under any of the Notes and Mortgages.  This means that all of Lender's rights in the Property are combined so that under the law Lender has one mortgage and I have one loan obligation which I will pay as provided in this Agreement.  This combining of notes and mortgages is known as a "Consolidation".

(B)    In the event that Exhibit A indicates that all of the Notes and Mortgages have already been combined by a previous agreement, then Lender and I agree to change the terms of Section II, paragraph (A) of this Agreement to the following:

Lender and I agree that all of the promises and agreements stated in the Notes and Mortgages - including any earlier agreements which combined, modified, or extended rights and obligations under any of the Notes and Mortgages - have been combined into one set of rights and obligations by an earlier agreement which is referred to in Exhibit A.  This means that all of the Lender's rights in the Property have already been combined so that under the law Lender already has one mortgage and I have one obligation which I will pay as provided in this Agreement.  The combining of notes and mortgages is known as a "Consolidation".

### III. AGREEMENT TO CHANGE TERMS OF THE CONSOLIDATED NOTE

Lender and I agree that the terms of the Notes are changed and restated to be the terms of the "Consolidated Note" which is attached to this Agreement as Exhibit C. The Consolidated Note contains the terms of payment for the amounts that I owe to Note Holder. I agree to pay the amounts due under the Notes in accordance with the terms of the Consolidated Note. The Consolidated Note will supersede all terms, covenants, and provisions of the Notes.

### IV. AGREEMENT TO CHANGE TERMS OF THE CONSOLIDATED MORTGAGE

Lender and I agree that the terms of the Mortgages are changed and restated to be the terms of the "Consolidated Mortgage" which is attached to this Agreement as Exhibit D. The Consolidated Mortgage secures the Consolidated Note and will constitute in law a single lien upon the Property. I agree to be bound by the terms set forth in the Consolidated Mortgage which will supercede all terms, covenants and provisions of the Mortgages.

### V. NO SET-OFF, DEFENSES

I agree that I have no right of set-off or counterclaim, or any defense to the obligations of the Consolidated Note or the Consolidated Mortgage.

### VI. BORROWER'S INTEREST IN THE PROPERTY

I promise that I am the lawful owner occupying the Property and that I have the right to consolidate, modify, and extend the Notes and Mortgages.

### VII. WRITTEN TERMINATION OR CHANGE OF THIS AGREEMENT

This Agreement may not be terminated, changed, or amended except by a written agreement signed by the party whose rights or obligations are being changed by that agreement.

### VIII. OBLIGATIONS OF BORROWERS AND OF PERSONS TAKING OVER BORROWER'S OR LENDER'S RIGHTS OR OBLIGATIONS

If more than one person signs this Agreement as Borrower, each of us is fully and personally obligated to keep all of Borrower's promises and obligations contained in this Agreement. The Note Holder may enforce its rights under this Agreement against each of us individually or against all of us together.

The terms of the Consolidated Note and the Consolidated Mortgage may not allow any person to take over my rights or obligations under this Agreement. Lender and I agree that if any person is permitted to take over my rights and obligations under this Agreement, that person will have all of my rights and will be obligated to keep all of my promises and agreements made in this Agreement. Similarly, any person who takes over Lender's rights or obligations under this Agreement will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Agreement.

### IX. LIEN LAW

I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (A) hold all amounts which I receive and which I have a right to receive from Lender under the Consolidated Note as a "trust fund;" and (B) use those amounts to pay for "cost of improvement" (as defined in the New York Lien Law) before I use them for any other purpose. The fact that I am holding those amounts as a "trust fund" means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section IX.

### X. TYPE OF PROPERTY

Check box (es) as applicable.

[ ] This Agreement covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six (6) residential dwelling units with each dwelling unit having its own separate cooking facilities.

[ ] This Agreement covers real property improved, or to be improved, by a one (1) or two (2) family dwelling.

[ ] This Agreement does not cover real property improved as described above.

By signing this Agreement, Lender and I agree to all of the above.

_Bobby H.J. Kim_

Lender: **Thornburg Mortgage Home Loans, Inc.**

By: ~~xxxxxxxxxxxxxxxxx~~ Karen Masuko, Esq.
   Authorized Signature

**Mortgage Electronic Registration Systems, Inc. – Mortgagee**

By: ~~xxxxxxxxxxxxxxxxx~~ Karen Masuko, Esq.

_____ Space Below This Line for Acknowledgments _____

STATE OF **New York**)
                    ) ss:
COUNTY OF **New York**)

On **February 21, 2007**, before me, the undersigned, personally appeared **Bobby H.J. Kim**, personally known to me or proved to me on the basis of satisfactory evidence to be the individuals whose names are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacities and that by his/her/their signatures on the instrument, the individuals, or the person upon behalf of which the individuals acted, executed the instrument.

Notary Public

KAREN MASUKO
Notary Public, State of New York
No. 01MA6012966
Qualified in New York County
Commission Expires Sept. 6, 2010

State of **New York**)
             SS:
County of **New York**)

On **February 21, 2007**, before me, the undersigned, personally appeared ~~xxxxxxxxxxxxxxxx~~ Karen Masuko, Esq. , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public

CHARLES W. EGAN
Notary Public, State of New York
No. 01EG6075925
Qualified in Nassau County
Commission Expires June 10, 2010

# INSTRUCTIONS

The following instructions apply if this Agreement is used in a consolidation, extension, or modification of a single family loan intended for possible sale to Fannie Mae or Freddie Mac.

(1)  All notes, security instruments, the most recent consolidation agreement and related agreements that modify, consolidate, or extend prior underlying obligations and which predate this Agreement must be listed in Exhibit A to this Agreement.  The language in Exhibit A to this Agreement is only a sample and may be revised as appropriate.

If any new money is advanced, number (1) on Exhibit A should refer to both (a) the "Gap" Mortgage (i.e., the new money mortgage discussed in (6) below), and (b) the "Gap" Note (i.e., new money note discussed in (6) below).

(2)  The metes and bounds description of the Property must be set forth in Exhibit B to this Agreement.

(3)  The Consolidated Note must be the current version of the applicable Single Family Fannie Mae/Freddie Mac Uniform Note (e.g., Forms 3233, 3501, 3502, 3504, or 3514) with the following language inserted at the top of the document:

For Fixed Rate Notes:

## CONSOLIDATED NOTE

**This Note amends and restates in their entirety, and is given in substitution for,
the Notes described in Exhibit A of the New York Consolidation, Extension,
and Modification Agreement dated the same date as this Note.**

For Adjustable Rate Notes:

## CONSOLIDATED ADJUSTABLE RATE NOTE

**This Note amends and restates in their entirety, and is given in substitution for,
the Notes described in Exhibit A of the New York Consolidation, Extension,
and Modification Agreement dated the same date as this Note.**

The Consolidated Note, with all blanks completed, and any applicable addendum or addenda, must be executed by the Borrower(s) and a copy of the executed Consolidated Note must be attached hereto as Exhibit C.  The repayment terms of the Consolidated Note (e.g., the consolidated principal amount, the monthly principal and interest payment, the interest rate and provisions for any interest rate and monthly payment changes applicable to the consolidated obligations) must be set forth in the Consolidated Note.  The dollar amount entered in the first blank in Section I of this Agreement and the consolidated principal amount of the Consolidated Note must be the same.

(4)  The Consolidated Mortgage must be the current version of the New York Single Family Fannie Mae/Freddie Mac Uniform Instrument (Form 3033).  The Consolidated Mortgage, with all blanks completed, and any applicable riders (such as an adjustable rate rider), must be attached hereto as Exhibit D.  The Consolidated Mortgage need not be signed by the Borrower(s).  The dollar amount entered in the first blank in Section I of this Agreement and the dollar amount entered in the corresponding blank in the Consolidated Mortgage must be the same.

(5)  For sales of loans to Fannie Mae and Freddie Mac, the Seller/Lender must deliver the executed and recorded original of this Agreement and all exhibits to it (or a certified true copy from the recording clerk, if the original is not yet available), together with the original Consolidated Note signed by the Borrower(s) and each original Note which is the original evidence of any part of Borrower's indebtedness set out in this Agreement.

(6)  If new funds are advanced at the time of the consolidation and modification evidenced by this Agreement, the new obligation must be evidenced by an original of the new money note (the "Gap" Note) and an original of the new money mortgage (the "Gap" Mortgage) on the current Fannie Mae/Freddie Mac Single Family Uniform Instrument (Form 3033).  The dollar amount entered in the second blank in Section I of this Agreement and the dollar amount entered in the corresponding blank on the Gap Note and Gap Mortgage must be the same.  If no new funds are advanced at the time of the consolidation and modification, then the second blank in Section I of this Agreement should be zero.  This new loan will then become a part of the Consolidated Note and the Consolidated Mortgage.  It is not necessary that the repayment terms of the new loan, as set out in the Gap Note, reflect the terms of the Consolidated Note.

## EXHIBIT A
### (List of Mortgages, Notes and Agreements)

(1)   The Mortgage given by Bobby H.J. Kim  and dated 2/21/2007 in favor of Mortgage Electronic Registrations Systems, Inc. (MERS) As Nominee for Thornburg Mortgage Home Loans, Inc. securing the original principal amount of $229,819.15. This Mortgage is on a Fannie Mae/Freddie Mac Security Instrument and will be recorded together with this Agreement is in the amount of $229,819.15. This Mortgage secures a Note dated 2/21/2007.

(2)   The Mortgage given by Philip L. Loeb dated 1/14/2002 in favor of Morgan Stanley Dean Witter Credit Corporation, securing the original principal amount of $799,700.00, recorded 2/27/2002 in Reel 3459 and Page 1756, in the County of New York, State of New York, which mortgage tax in the amount of $16,047.15 was duly paid.  This Mortgage secures a Note dated 1/14/2002.

> This Mortgage was extended and modified by Philip L. Loeb and Morgan Stanley Dean Witter Credit Corporation by Extension and Modification Agreement dated 8/14/2003 and recorded on 12/01/2003 in CRFN # 2003000480179 in the County of New York, State of New York. This extends and modifies Mortgage # 2.

> This Mortgage was further extended and modified by Philip L. Loeb and Morgan Stanley Dean Witter Credit Corporation by Extension and Modification Agreement dated 1/11/2005 and recorded on 5/06/2005 in CRFN # 2005000264988 in the County of New York, State of New York. This extends and modifies Mortgage # 2.

> This Mortgage as extended and modified was assigned by Morgan Stanley Credit Corporation f/k/a Morgan Stanley Dean Witter Credit Corporation to Washington Mutual Bank, FA by Assignment of Mortgage dated 12/23/2005 and recorded on 3/22/2006 in CRFN # 2006000161981 in the County of New York, State of New York.

(3)   The Mortgage given by Bobby H.J. Kim dated 12/29/2005 in favor of Washington Mutual Bank, FA, securing the original principal amount of $512,800.00 (with a negative amortization not to exceed the amount of $564,080.00), recorded 3/22/2006 in CRFN 2006000161982 in the County of New York, State of New York, which mortgage tax in the amount of $12,239.18 was duly paid.  This Mortgage secures a Note dated 12/29/2005.

> This Mortgage was consolidated, extended, and modified by Bobby H.J. Kim and Washington Mutual Bank, FA by Consolidation, Extension and Modification Agreement dated 12/29/2005 and recorded on 5/02/2006 in CRFN # 2006000242651 in the County of New York, State of New York, to form a single lien in the amount of $1,312,500.00 (with a negative amortization not to exceed the amount of $1,443,750.00). This consolidates Mortgages # 2 and # 3.

> This Mortgage as consolidated is being assigned by Washington Mutual Bank f/k/a Washington Mutual Bank, FA to Mortgage Electronic Registration Systems, Inc. (MERS) As Nominee for Thornburg Mortgage Home Loans, Inc. ISAOA/ATIMA by Assignment of Mortgage dated 2/9/2007 to be simultaneously recorded herewith, in the County of New York, State of New York.

> At this date, the unpaid principal balance secured by this Mortgage is $1,345,180.85.

> These Mortgages #1, #2 and #3 are consolidated by Bobby H.J. Kim and Mortgage Electronic Registrations Systems, Inc. (MERS) As Nominee for Thornburg Mortgage Home Loans, Inc. ISAOA/ATIMA by Consolidation, Extension, Modification Agreement dated 02/21/2007 and to be simultaneously recorded herewith in the County of New York, State of New York,  to form a single lien in the amount of $1,575,000.00.

# EXHIBIT B

## SCHEDULE A

The Condominium Unit (hereinafter referred to as "Unit") in the building known as The Beekman Landing Condominium (hereinafter referred to as the "Building") and by the street number 130 Beckman Street a/k/a 227, 229 and 231 Water Street, New York, N.Y., Borough of Manhattan, County of New York, City and State of New York, said Unit being designated and described as the Unit 5B in a certain Declaration made pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act"), establishing a plan for condominium ownership of the Building and the land upon which the Building is situate (hereinafter referred to as the "Land"), which Declaration was dated August 8, 2001 and recorded on December 7, 2001 in the New York Office of the Register of the City of New York in Reel 3405 Page 199, as amended by the First Amendment to the Declaration dated as of December 18, 2001 and recorded on December 20, 2001 in the New York County Office of the Register of the City of New York in Reel 3413 Page 1537 (which Declaration and Amendment thereto are hereinafter collectively referred to the "Declaration"). The Unit is also designated as Tax Lot 1118 in Block 97 of Section 1 of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City of New York and on the Floor Plans of the Building, certified by Simon Schwarz Associates on December 5, 2001, and filed with Real Property Assessment Department of the City of New York on December 7, 2001, as Condominium Plan 1218 and also filed in the City Register's Office on December 7, 2001 as Map No. 5850.

TOGETHER with the 7.51 percent undivided interest in the Common Elements, as such term is defined in the Declaration;

The Land upon which the Building containing the Unit is situate is more particularly bounded and described as follows:

**PARCEL A:**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly side of Water Street, distant 50 feet 1 inch easterly from the corner formed by the intersection of the said southerly side of Water Street and the easterly side of Beekman Street;

THENCE easterly along said southerly side of Water Street, 16 feet 6 inches to a point opposite the centre line of a party wall;

THENCE southerly along the centre line of said party wall and a line in continuation thereof, 72 feet 10-1/2 inches to the centre line of the block;

THENCE westerly along the said centre line of the block, 16 feet 7 inches to the easterly face of the independent wall of the building upon the premises adjoining the same on the west;

THENCE northerly along the easterly face of the said last mentioned wall, 13 feet 4-3/4 inches to the southerly face of the rear wall of the building upon the premises herein described;

THENCE westerly along the southerly face of the said last mentioned wall, 2 inches to a point in the centre of the 24 inch wall standing between the building on the premises herein described and the building upon the premises adjoining on the west; and

THENCE northerly along the centre line of the said last mentioned wall, 59 feet 6 inches to the southerly side of Water Street, the point or place of BEGINNING.

**Date Printed** January 18, 2007

## SCHEDULE A - continued

**PARCEL B:**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northeasterly side of Beekman Street with the southeasterly side of Water Street;

RUNNING THENCE northeasterly along the southeasterly side of Water Street, 24 feet 9 inches to a point in the center or in a line in continuation of the center of 12 inch wall standing half on the premises herein described and half on the premises adjoining on the northeast;

THENCE southeasterly along a line in continuation of the center and along the center of said 12 inch wall and along the southwesterly face of southwesterly wall of the six-story brick building on the premises described in Schedule A, 54 feet 4 inches to the northwesterly face of the northwesterly wall of the brick building on the premises known as 134 Beekman Street;

THENCE southwesterly along the northwesterly face of said northwesterly wall, 25 feet 6 inches to the northeasterly side of Beekman Street; and

THENCE northwesterly along the northeasterly side of Beekman Street, 53 feet 10 inches to the corner, the point or place of BEGINNING.

## SCHEDULE A - continued

**PARCEL C:**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at a point on the southeasterly side of Water Street, distant 24 feet 9 inches northeasterly from the corner formed by the intersection of the northeasterly side of Beekman Street with the southeasterly side of Water Street;

RUNNING THENCE northeasterly along the southeasterly side of Water Street, 25 feet 4 inches to a point in the center or in a line in continuation of the center of a 24 inch wall standing half on the premises herein described and half on the premises adjoining on the northeast;

THENCE southeasterly along a line in continuation of the center and along the center of said 24 inch wall and along the northeasterly face of the northeasterly wall of the six story brick building and of the one story brick building on the premises described in Schedule A, 93 feet 4 inches to the southeasterly face of the southeasterly wall of said one story brick building on the premises described in Schedule A;

THENCE southwesterly along said southeasterly face of said southeasterly wall, 25 feet 4-1/2 inches to the southwesterly face of the southwesterly wall of said one story brick building;

THENCE northwesterly along said southwesterly face of said southwesterly wall of said one story brick building and along the southwesterly face of the southwesterly wall of the six story brick building on the premises described in Schedule A and through the center of a party wall, 92 feet 9 inches to the southeasterly side of Water Street, the point or place of BEGINNING.

*For conveyancing only, if intended to be conveyed.* { Together with all right, title and interest of, in and to any streets and roads abutting the above described premises, to the center line thereof.

**Date Printed** January 18, 2007

This Note amends and restates in their entirety, and is given in substitution for, the Notes described in EXHIBIT A of the New York Consolidation, Extension and Modification Agreement dated the same date as this Note.

**Exhibit C**

## INTEREST-ONLY PERIOD ADJUSTABLE RATE NOTE
### (One-Year LIBOR Index (As Published In *The Wall Street Journal*)
### Rate Caps - 10 Year Interest Only Period)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

MERS TELEPHONE: (888) 679-6377

| **February 21, 2007** | **NEW YORK** | **NEW YORK** |
|---|---|---|
| [Date] | [City] | [State] |

**130 BEEKMAN STREET #5B, NEW YORK, NEW YORK 10038**
[Property Address]

1. **BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. **$ 1,575,000.00** (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **Thornburg Mortgage Home Loans, Inc, A Delaware Corporation**. I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

2. **INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **6.250%**. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

3. **PAYMENTS**

(A) Time and Place of Payments

I will make a payment on the **FIRST** day of every month, beginning on **April 1, 2007**. Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.

I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on **March 1, 2037**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **Central Loan Admin & Reporting, P O Box 986, Newark, NEW JERSEY 01718-0597**, or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. **$ 8,203.13** until the first Change Date. After the first Change Date, my monthly payment will be in an amount sufficient to pay accrued interest, at the rate determined as described in Section 4 of this Note until the First Principal and Interest Payment Due Date. On that date and thereafter, my monthly payment will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of changes in monthly payment.

(C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

MULTISTATE INTEREST-ONLY PERIOD ADJUSTABLE RATE NOTE - ONE-YEAR LIBOR INDEX –
10 Year Interest Only Period - Single Family - Fannie Mae Uniform Instrument

Form 3537 6/05 (rev. 9/06)
Page 1 of 4
Initials:

4. **ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

(A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the **FIRST** day of **March, 2014**, and the adjustable interest rate I will pay may change on that day every 12th month thereafter.

The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **One and Seven-Eighths** percentage points (**1.875%**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of my monthly payment. For payment adjustments occurring before the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay all accrued interest each month on the unpaid principal balance at the new interest rate. If I make a voluntary payment of principal before the First Principal and Interest Payment Due Date, my payment amount for subsequent payments will be reduced to the amount necessary to repay all accrued interest on the reduced principal balance at the current interest rate. For payment adjustments occurring on or after the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay unpaid principal and interest that I am expected to owe in full on the Maturity Date at the current interest rate in substantially equal payments.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **11.250%** or less than **1.875%**. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage point(s) (2.000%) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than **11.250%**.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

(G) Date of First Principal and Interest Payment

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be that date which is the 10th anniversary date of the first payment due date, as reflected in Section 3(A) of the Note.

5. **BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

6. **LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that

MULTISTATE INTEREST-ONLY PERIOD ADJUSTABLE RATE NOTE - ONE-YEAR LIBOR INDEX –
10 Year Interest Only Period - Single Family - Fannie Mae Uniform Instrument

Form 3537 6/05 (rev. 9/06)
Page 2 of 4
Initials: _____

exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.     BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 2.00% of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.     GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.     OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.    WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.    UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not

MULTISTATE INTEREST-ONLY PERIOD ADJUSTABLE RATE NOTE - ONE-YEAR LIBOR INDEX –
10 Year Interest Only Period - Single Family - Fannie Mae Uniform Instrument

Form 3537 6/05 (rev. 9/06)
Page 3 of 4
Initials: _____

exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
Bobby H. J. Kim                          -Borrower

_____ (Seal)
                                         -Borrower

_____ (Seal)
                                         -Borrower

_____ (Seal)
                                         -Borrower

*[Sign Original Only]*

MULTISTATE INTEREST-ONLY PERIOD ADJUSTABLE RATE NOTE - ONE-YEAR LIBOR INDEX –
10 Year Interest Only Period - Single Family - Fannie Mae Uniform Instrument

Form 3537 6/05 (rev. 9/06)
Page 4 of 4

Return To:
Thornburg Mortgage Home Loans, Inc.
3101 Technology Drive
Edmond, OKLAHOMA 73013
Attn.: Attn: Shipping Dept./Doc. Cont
Prepared By:

# EXHIBIT D

# CONSOLIDATED

[Space Above This Line For Recording Data]

## MORTGAGE

## WORDS USED OFTEN IN THIS DOCUMENT

(A) "Security Instrument." This document, which is dated February 21, 2007, together with all Riders to this document, will be called the "Security Instrument."

(B) "Borrower." Bobby H. J. Kim an unmarried person whose address is 130 Beekman Street #5B, New York, NEW YORK 10038 sometimes will be called "Borrower" and sometimes simply "I" or "me."

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS. **FOR PURPOSES OF RECORDING THIS MORTGAGE, MERS IS THE MORTGAGEE OF RECORD.**

(D) "Lender." Thornburg Mortgage Home Loans, Inc, A Delaware Corporation will be called "Lender." Lender is a corporation or association which exists under the laws of The State Of Delaware. Lender's address is Central Loan Admin & Reporting, P O Box 986, Newark, NEW JERSEY 01718-0597.

Section: **1**     Block: **97**     Lot: **1118**     Unit: **5B**

(E) "Note." The note signed by Borrower and dated February 21, 2007, will be called the "Note." The Note shows that I owe Lender One Million Five Hundred Seventy Five Thousand And 00/100 Dollars (U.S. $1,575,000.00) plus interest and other amounts that may be payable. I have promised to pay this debt in Periodic Payments and to pay the debt in full by March 1, 2037.

(F) "Property." The property that is described below in the section titled "Description of the Property," will be called the "Property."

(G) "Loan." The "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

NEW YORK - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS     Form 3033 1/01
VMP-6A(NY) (0508).01        Page 1 of 18

Initials: _____

... ...    ... ...    ...    ...      ...   ...   ...  ...      ...  ...    ...

**(H)** **"Sums Secured."** The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

**(I)** **"Riders."** All Riders attached to this Security Instrument that are signed by Borrower will be called "Riders." The following Riders are to be signed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider    [X] Condominium Rider    [ ] Second Home Rider
[ ] Balloon Rider    [ ] Planned Unit Development Rider    [ ] 1-4 Family Rider
[ ] VA Rider    [ ] Biweekly Payment Rider    [X] Other(s) [specify]
            Legal Description

**(J)** **"Applicable Law."** All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions will be called "Applicable Law."

**(K)** **"Community Association Dues, Fees, and Assessments."** All dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will be called "Community Association Dues, Fees, and Assessments."

**(L)** **"Electronic Funds Transfer."** "Electronic Funds Transfer" means any transfer of money, other than by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a merchant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M)** **"Escrow Items."** Those items that are described in Section 3 will be called "Escrow Items."

**(N)** **"Miscellaneous Proceeds."** "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than Insurance Proceeds, as defined in, and paid under the coverage described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of Condemnation or sale to avoid Condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent domain is known as "Condemnation."

**(O)** **"Mortgage Insurance."** "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P)** **"Periodic Payment."** The regularly scheduled amount due for (i) principal and interest under the Note, and (ii) any amounts under Section 3 will be called "Periodic Payment."

**(Q)** **"RESPA."** "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

### BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY

I mortgage, grant and convey the Property to MERS (solely as nominee for Lender and Lender's successors in interest) and its successors in interest subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A) Pay all the amounts that I owe Lender as stated in the Note including, but not limited to, all renewals, extensions and modifications of the Note;

NEW YORK - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS      Form 3033 1/01
VMP-6A(NY) (0508).01      Page 2 of 18
     Initials: _____

(B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(C) Keep all of my other promises and agreements under this Security Instrument and the Note.

I understand and agree that MERS holds only legal title to the rights granted by me in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:

(A) to exercise any or all of those rights, including, but not limited to, the right to foreclose and sell the Property; and

(B) to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

### DESCRIPTION OF THE PROPERTY

I give MERS (solely as nominee for Lender and Lender's successors in interest) rights in the Property described in (A) through (G) below:

(A) The Property which is located at

**130 BEEKMAN STREET #5B** .[Street]

**NEW YORK** [City, Town or Village] , New York **10038** [Zip Code].

This Property is in **New York** County. It has the following legal description:

**SEE EXHIBIT "A" ATTACHED HERETO AND BY THIS REFERENCE MADE A PART HEREOF.**

(B) All buildings and other improvements that are located on the Property described in subsection (A) of this section;

(C) All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property;"

(D) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;

(E) All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;

(F) All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and

(G) All replacements of or additions to the Property described in subsections (B) through (F) of this section and all Insurance Proceeds for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) through (F) of this section.

### BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY

# SCHEDULE A

The Condominium Unit (hereinafter referred to as "Unit") in the building known as The Beekman Landing Condominium (hereinafter referred to as the "Building") and by the street number 130 Beckman Street a/k/a 227, 229 and 231 Water Street, New York, N.Y., Borough of Manhattan, County of New York, City and State of New York, said Unit being designated and described as the Unit 5B in a certain Declaration made pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act"), establishing a plan for condominium ownership of the Building and the land upon which the Building is situate (hereinafter referred to as the "Land"), which Declaration was dated August 8, 2001 and recorded on December 7, 2001 in the New York Office of the Register of the City of New York in Reel 3405 Page 199, as amended by the First Amendment to the Declaration dated as of December 18, 2001 and recorded on December 20, 2001 in the New York County Office of the Register of the City of New York in Reel 3413 Page 1537 (which Declaration and Amendment thereto are hereinafter collectively referred to the "Declaration"). The Unit is also designated as Tax Lot 1118 in Block 97 of Section 1 of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City of New York and on the Floor Plans of the Building, certified by Simon Schwarz Associates on December 5, 2001, and filed with Real Property Assessment Department of the City of New York on December 7, 2001, as Condominium Plan 1218 and also filed in the City Register's Office on December 7, 2001 as Map No. 5850.

TOGETHER with the 7.51 percent undivided interest in the Common Elements, as such term is defined in the Declaration;

The Land upon which the Building containing the Unit is situate is more particularly bounded and described as follows:

PARCEL A:

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly side of Water Street, distant 50 feet 1 inch easterly from the corner formed by the intersection of the said southerly side of Water Street and the easterly side of Beekman Street;

THENCE easterly along said southerly side of Water Street, 16 feet 6 inches to a point opposite the centre line of a party wall;

THENCE southerly along the centre line of said party wall and a line in continuation thereof, 72 feet 10-1/2 inches to the centre line of the block;

THENCE westerly along the said centre line of the block, 16 feet 7 inches to the easterly face of the independent wall of the building upon the premises adjoining the same on the west;

THENCE northerly along the easterly face of the said last mentioned wall, 13 feet 4-3/4 inches to the southerly face of the rear wall of the building upon the premises herein described;

THENCE westerly along the southerly face of the said last mentioned wall, 2 inches to a point in the centre of the 24 inch wall standing between the building on the premises herein described and the building upon the premises adjoining on the west; and

THENCE northerly along the centre line of the said last mentioned wall, 59 feet 6 inches to the southerly side of Water Street, the point or place of BEGINNING.

**Date Printed** January 18, 2007

## SCHEDULE A - continued

**PARCEL B:**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northeasterly side of Beekman Street with the southeasterly side of Water Street;

RUNNING THENCE northeasterly along the southeasterly side of Water Street, 24 feet 9 inches to a point in the center or in a line in continuation of the center of 12 inch wall standing half on the premises herein described and half on the premises adjoining on the northeast;

THENCE southeasterly along a line in continuation of the center and along the center of said 12 inch wall and along the southwesterly face of southwesterly wall of the six-story brick building on the premises described in Schedule A, 54 feet 4 inches to the northwesterly face of the northwesterly wall of the brick building on the premises known as 134 Beekman Street;

THENCE southwesterly along the northwesterly face of said northwesterly wall, 25 feet 6 inches to the northeasterly side of Beekman Street; and

THENCE northwesterly along the northeasterly side of Beekman Street, 53 feet 10 inches to the corner, the point or place of BEGINNING.

**Date Printed** January 18, 2007

## SCHEDULE A - continued

**PARCEL C:**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at a point on the southeasterly side of Water Street, distant 24 feet 9 inches northeasterly from the corner formed by the intersection of the northeasterly side of Beekman Street with the southeasterly side of Water Street;

RUNNING THENCE northeasterly along the southeasterly side of Water Street, 25 feet 4 inches to a point in the center or in a line in continuation of the center of a 24 inch wall standing half on the premises herein described and half on the premises adjoining on the northeast;

THENCE southeasterly along a line in continuation of the center and along the center of said 24 inch wall and along the northeasterly face of the northeasterly wall of the six story brick building and of the one story brick building on the premises described in Schedule A, 93 feet 4 inches to the southeasterly face of the southeasterly wall of said one story brick building on the premises described in Schedule A;

THENCE southwesterly along said southeasterly face of said southeasterly wall, 25 feet 4-1/2 inches to the southwesterly face of the southwesterly wall of said one story brick building;

THENCE northwesterly along said southwesterly face of said southwesterly wall of said one story brick building and along the southwesterly face of the southwesterly wall of the six story brick building on the premises described in Schedule A and through the center of a party wall, 92 feet 9 inches to the southeasterly side of Water Street, the point or place of BEGINNING.

*For conveyancing only,* *if intended to be conveyed.* Together with all right, title and interest of, in and to any streets and roads abutting the above described premises, to the center line thereof.

**Date Printed** January 18, 2007

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

## PLAIN LANGUAGE SECURITY INSTRUMENT

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary in different parts of the country. My promises and agreements are stated in "plain language."

## COVENANTS

I promise and I agree with Lender as follows:

1. **Borrower's Promise to Pay.** I will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note. I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument.

Payments due under the Note and this Security Instrument shall be made in U.S. currency. If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require my payment be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 15 of this Security Instrument. Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due. If Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights. Lender is not obligated to apply such lesser payments when it accepts such payments. If interest on principal accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until I make payments to bring the Loan current. If I do not do so within a reasonable period of time, Lender will either apply such funds or return them to me. In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure. No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.

2. **Application of Borrower's Payments and Insurance Proceeds.** Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order:

First, to pay interest due under the Note;

Next, to pay principal due under the Note; and

Next, to pay the amounts due Lender under Section 3 of this Security Instrument.

Such payments will be applied to each Periodic Payment in the order in which it became due.

Any remaining amounts will be applied as follows:

First, to pay any late charges;

Next, to pay any other amounts due under this Security Instrument; and

Next, to reduce the principal balance of the Note.

If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late

charge. If more than one Periodic Payment is due, Lender may apply any payment received from me: First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Voluntary prepayments will be applied as follows: First, to any prepayment charges; and Next, as described in the Note.

Any application of payments, Insurance Proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

**3. Monthly Payments For Taxes And Insurance.**

**(a) Borrower's Obligations.**

I will pay to Lender all amounts necessary to pay for taxes, assessments, water charges, sewer rents and other similar charges, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a Loss Reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward payment of the following items which are called "Escrow Items:"

(1) The taxes, assessments, water charges, sewer rents and other similar charges, on the Property which under Applicable Law may be superior to this Security Instrument as a Lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "Lien;"

(2) The leasehold payments or ground rents on the Property (if any);

(3) The premium for any and all insurance required by Lender under Section 5 of this Security Instrument;

(4) The premium for Mortgage Insurance (if any);

(5) The amount I may be required to pay Lender under Section 10 of this Security Instrument instead of the payment of the premium for Mortgage Insurance (if any); and

(6) If required by Lender, the amount for any Community Association Dues, Fees, and Assessments.

After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Escrow Funds." I will pay Lender the Escrow Funds for Escrow Items unless Lender waives my obligation to pay the Escrow Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Escrow Funds for any or all Escrow Items at any time. Any such waiver must be in writing. In the event of such waiver, I will pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Escrow Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 of this Security Instrument to repay to Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 of this Security Instrument and, upon the revocation, I will pay to Lender all Escrow Funds, and in amounts, that are then required under this Section 3.

I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Escrow Funds I will have to pay by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Escrow Funds in an amount sufficient to permit Lender to apply the Escrow Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Escrow Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Escrow Funds Lender can collect and hold, Lender will be limited to the lower amount.

**(b) Lender's Obligations.**

Lender will keep the Escrow Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Escrow Funds. Lender will use the Escrow Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law. Lender will give to me, without charge, an annual accounting of the Escrow Funds. That accounting will show all additions to and deductions from the Escrow Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Escrow Funds, for using the Escrow Funds to pay Escrow Items, for making a yearly analysis of my payment of Escrow Funds or for receiving, or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Escrow Funds and if Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Escrow Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Escrow Funds, or (2) Applicable Law requires Lender to pay interest on the Escrow Funds.

**(c) Adjustments to the Escrow Funds.**

Under Applicable Law, there is a limit on the amount of Escrow Funds Lender may hold. If the amount of Escrow Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Escrow Funds.

If, at any time, Lender has not received enough Escrow Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due, but the number of payments will not be more than 12.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Escrow Funds that are then being held by Lender.

**4. Borrower's Obligation to Pay Charges, Assessments And Claims.** I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues, Fees, and Assessments (if any) due on the Property. If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument. In this Security Instrument, the word "Person" means any individual, organization, governmental authority or other party.

I will promptly pay or satisfy all Liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior Lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior Lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith, I argue or defend against the superior Lien in a lawsuit so that in Lender's opinion, during the lawsuit, the superior Lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other Lien an agreement, approved in writing by Lender, that the Lien of this Security Instrument is

superior to the Lien held by that Person. If Lender determines that any part of the Property is subject to a superior Lien, Lender may give Borrower a notice identifying the superior Lien. Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior Lien or take one or more of the actions mentioned in this Section 4.

Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with the Loan, unless Applicable Law does not permit Lender to make such a charge.

**5. Borrower's Obligation to Maintain Hazard Insurance or Property Insurance.** I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property. The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender. What Lender requires under the last sentence can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. Lender may require me to pay either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect the flood zone determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review.

If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment.

All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewals will be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a Standard Mortgage Clause and will name Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company for loss or damage to the Property is called "Insurance Proceeds." Unless Lender and I otherwise agree in writing, any Insurance Proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Insurance Proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c) Lender and I have agreed in writing not to use the Insurance Proceeds for that purpose. During the period

that any repairs or restorations are being made, Lender may hold any Insurance Proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction. However, this inspection will be done promptly. Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, Lender is not required to pay me any interest or earnings on the Insurance Proceeds. I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the Insurance Proceeds. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the Insurance Proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument. Such Insurance Proceeds will be applied in the order provided for in Section 2. If any of the Insurance Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining Insurance Proceeds will be paid to me.

If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 of this Security Instrument or otherwise, I give Lender my rights to any Insurance Proceeds in an amount not greater than the amounts unpaid under the Note and this Security Instrument. I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance policies covering the Property, if the rights are applicable to the coverage of the Property. Lender may use the Insurance Proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Borrower's Obligations to Occupy The Property.** I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

**7. Borrower's Obligations to Maintain And Protect The Property And to Fulfill Any Lease Obligations.**

**(a) Maintenance and Protection of the Property.**

I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate. Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition. Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or Condemnation (as defined in the definition of Miscellaneous Proceeds) proceeds are paid because of loss or damage to, or Condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes. Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed. If the insurance or Condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration.

**(b) Lender's Inspection of Property.**

Lender, and others authorized by Lender, may enter on and inspect the Property. They will do so in a reasonable manner and at reasonable times. If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property. Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

**8. Borrower's Loan Application.** If, during the application process for the Loan, I, or any Person or entity acting at my direction or with my knowledge or consent, made false, misleading, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan (or did not provide Lender with such information), Lender will treat my actions as a default under this Security Instrument. False, misleading, or inaccurate statements about information important to Lender would include a misrepresentation of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading, or inaccurate statement of important information.

**9. Lender's Right to Protect Its Rights in The Property.** If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in bankruptcy, in probate, for Condemnation or Forfeiture (as defined in Section 11), proceedings which could give a Person rights which could equal or exceed Lender's interest in the Property or under this Security Instrument, proceedings for enforcement of a Lien which may become superior to this Security Instrument, or to enforce laws or regulations); or (c) I have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument.

Lender's actions may include, but are not limited to: (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property; (c) paying sums to eliminate any Lien against the Property that may be equal or superior to this Security Instrument; (d) appearing in court; and (e) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender can also enter the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, have utilities turned on or off, and take any other action to secure the Property. Although Lender may take action under this Section 9, Lender does not have to do so and is under no duty to do so. I agree that Lender will not be liable for not taking any or all actions under this Section 9.

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will pay interest on those amounts at the interest rate set forth in the Note. Interest on each amount will begin on the date that the amount is spent by Lender. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

If I do not own, but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the full title (sometimes called "Fee Title") to the Property, my lease interest and the Fee Title will not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, I will pay the premiums for the Mortgage Insurance. If, for any reason, the Mortgage Insurance coverage ceases to be available from the mortgage insurer that previously provided such insurance and Lender required me to make separate payments toward the premiums for Mortgage Insurance, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer. However, the cost of this Mortgage Insurance coverage will be substantially equivalent to the cost to me of the previous Mortgage Insurance coverage, and the alternate mortgage insurer will be selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Lender will establish a non-refundable "Loss Reserve" as a substitute for the Mortgage Insurance coverage. I will continue to pay to Lender each month an amount equal to one-twelfth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the Mortgage Insurance would have covered. The Loss Reserve is non-refundable even if the Loan is ultimately paid in full and Lender is not required to pay me any interest on the Loss Reserve. Lender can no longer require Loss Reserve payments if: (a) Mortgage Insurance coverage again becomes available through an insurer selected by Lender; (b) such Mortgage Insurance is

NEW YORK - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS  
VMP-6A(NY) (0508).01  Page 9 of 18

Form 3033 1/01

Initials: ___

obtained; (c) Lender requires separately designated payments toward the premiums for Mortgage Insurance; and (d) the Mortgage Insurance coverage is in the amount and for the period of time required by Lender.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separate payments toward the premiums for Mortgage Insurance, I will pay the Mortgage Insurance premiums, or the Loss Reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the Loss Reserve payments, in the manner described in Section 3 of this Security Instrument. Nothing in this Section 10 will affect my obligation to pay interest at the rate provided in the Note.

A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy.

Mortgage insurers assess their total risk on all Mortgage Insurance from time to time. Mortgage insurers may enter into agreements with other parties to share or change their risk, or to reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums).

As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, or any other entity may receive (directly or indirectly) amounts that come from a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk, or reducing losses. If these agreements provide that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." It also should be understood that: (a) any of these agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. These agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has - if any - regarding the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right (a) to receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

**11. Agreements About Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are assigned to and will be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds will be applied to restoration or repair of the Property, if (a) the restoration or repair is economically feasible, and (b) Lender's security given in this Security Instrument is not lessened. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to verify that the work has been completed to Lender's satisfaction. However, the inspection will be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on the Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security given in this Security Instrument would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Sums Secured will be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Sums Secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Miscellaneous Proceeds will be applied to the Sums Secured whether or not the sums are then due.

If I abandon the Property, or if, after Lender sends me notice that the Opposing Party (as defined in the next sentence) offered to make an award to settle a claim for damages, I fail to respond to Lender within 30 days after the date Lender gives notice, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Sums Secured, whether or not then due. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a right of action in regard to Miscellaneous Proceeds.

I will be in default under this Security Instrument if any civil or criminal action or proceeding that Lender determines could result in a court ruling (a) that would require Forfeiture of the Property, or (b) that could damage Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" is a court action to require the Property, or any part of the Property, to be given up. I may correct the default by obtaining a court ruling that dismisses the court action, if Lender determines that this court ruling prevents Forfeiture of the Property and also prevents any damage to Lender's interest in the Property or rights under this Security Instrument. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Section 19 of this Security Instrument, even if Lender has required Immediate Payment in Full (as defined in Section 22). The proceeds of any award or claim for damages that are attributable to the damage or reduction of Lender's interest in the Property are assigned, and will be paid, to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

**12. Continuation of Borrower's Obligations And of Lender's Rights.**

**(a) Borrower's Obligations.**

Lender may allow me, or a Person who takes over my rights and obligations, to delay or to change the amount of the Periodic Payments. Even if Lender does this, however, I will still be fully obligated under the Note and under this Security Instrument unless Lender agrees to release me, in writing, from my obligations.

Lender may allow those delays or changes for me or a Person who takes over my rights and obligations, even if Lender is requested not to do so. Even if Lender is requested to do so, Lender will not be required to (1) bring a lawsuit against me or such a Person for not fulfilling obligations under the Note or under this Security Instrument, or (2) refuse to extend time for payment or otherwise modify amortization of the Sums Secured.

**(b) Lender's Rights.**

Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if: (1) Lender obtains insurance, pays taxes, or pays other claims, charges or Liens against the Property; (2) Lender accepts payments from third Persons; or (3) Lender accepts payments in amounts less than the amount then due, Lender will have the right under Section 22 below to demand that I make Immediate Payment in Full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

**13. Obligations of Borrower And of Persons Taking Over Borrower's Rights or Obligations.** If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender may agree with the other Borrowers to delay enforcing any of Lender's rights, to modify, or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent.

Subject to the provisions of Section 18 of this Security Instrument, any Person who takes over my rights or obligations under this Security Instrument in writing, and is approved by Lender in writing, will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Borrower will not be released from Borrower's obligations and liabilities under this Security Instrument unless Lender agrees to such release in writing. Any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's promises and agreements made in this Security Instrument except as provided under Section 20.

**14. Loan Charges.** Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. With regard to other fees, the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that Lender cannot charge that fee. Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to Applicable Law which sets maximum loan charges, and that Applicable Law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits: (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (even if a prepayment charge is provided for under the Note). If I accept such a refund that is paid directly to me, I will waive any right to bring a lawsuit against Lender because of the overcharge.

**15. Notices Required under this Security Instrument.** All notices given by me or Lender in connection with this Security Instrument will be in writing. Any notice to me in connection with this Security Instrument is considered given to me when mailed by first class mail or when actually delivered to my notice address if sent by other means. Notice to any one Borrower will be notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address is the address of the Property unless I give notice to Lender of a different address. I will promptly notify Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated on the first page of this Security Instrument unless Lender has given me notice of another address. Any notice in connection with this Security Instrument is given to Lender when it is actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Law That Governs this Security Instrument; Word Usage.** This Security Instrument is governed by federal law and the law of New York State. All rights and obligations contained in this

NEW YORK - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3033 1/01
VMP-6A(NY) (0508).01                                    Page 12 of 18

Initials: _____

Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract. If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist.

As used in this Security Instrument: (a) words of the masculine gender mean and include corresponding words of the feminine and neuter genders; (b) words in the singular mean and include the plural, and words in the plural mean and include the singular; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** I will be given one copy of the Note and of this Security Instrument.

**18. Agreements about Lender's Rights If the Property Is Sold or Transferred.** Lender may require Immediate Payment in Full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. If Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require Immediate Payment in Full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires Immediate Payment in Full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**19. Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** Even if Lender has required Immediate Payment in Full, I may have the right to have enforcement of this Security Instrument stopped. I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) another period as Applicable Law might specify for the termination of my right to have enforcement of the Loan stopped; or (c) a judgment has been entered enforcing this Security Instrument. In order to have this right, I will meet the following conditions:

(a) I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if Immediate Payment in Full had never been required;

(b) I correct my failure to keep any of my other promises or agreements made in this Security Instrument;

(c) I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

(d) I do whatever Lender reasonably requires to assure that Lender's interest in the Property and rights under this Security Instrument and my obligations under the Note and under this Security Instrument continue unchanged.

Lender may require that I pay the sums and expenses mentioned in (a) through (d) in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

If I fulfill all of the conditions in this Section 19, then this Security Instrument will remain in full effect as if Immediate Payment in Full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required Immediate Payment in Full under Section 18 of this Security Instrument.

NEW YORK - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
VMP-6A(NY) (0508).01                    Page 13 of 18                    Form 3033 1/01

Initials: _____

**20. Note Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Lender's and Borrower's Right to Notice of Grievance.** The Note, or an interest in the Note, together with this Security Instrument, may be sold one or more times. I might not receive any prior notice of these sales.

The entity that collects the Periodic Payments and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Note. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. Applicable Law requires that I be given written notice of any change of the Loan Servicer. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by RESPA or Applicable Law. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to me will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither I nor Lender may commence, join or be joined to any court action (as either an individual party or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other has not fulfilled any of its obligations under this Security Instrument, unless the other is notified (in the manner required under Section 15 of this Security Instrument) of the unfulfilled obligation and given a reasonable time period to take corrective action. If Applicable Law provides a time period which will elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to me under Section 22 and the notice of the demand for payment in full given to me under Section 22 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20. All rights under this paragraph are subject to Applicable Law.

**21. Continuation of Borrower's Obligations to Maintain and Protect the Property.** The federal laws and the laws of New York State that relate to health, safety or environmental protection are called "Environmental Law." Environmental Law classifies certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These substances are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Law and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances." "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law. An "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

I will not do anything affecting the Property that violates Environmental Law, and I will not allow anyone else to do so. I will not cause or permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. I also will not do, nor allow anyone else to do, anything affecting the Property that: (a) is in violation of any Environmental Law; (b) creates an Environmental Condition; or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The promises in this paragraph do not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products). I may use or store these small quantities on the Property. In addition, unless Environmental Law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

I will promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which I have actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If I learn, or any governmental or regulatory authority, or any private party, notifies me that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I will promptly take all necessary remedial actions in accordance with Environmental Law.

Nothing in this Security Instrument creates an obligation on Lender for an Environmental Cleanup.

## NON-UNIFORM COVENANTS

I also promise and agree with Lender as follows:

**22. Lender's Rights If Borrower Fails to Keep Promises and Agreements. Except as provided in Section 18 of this Security Instrument, if all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "Immediate Payment in Full."**

**If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another Person may acquire the Property. This is known as "Foreclosure and Sale." In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by Applicable Law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.**

**Lender may require Immediate Payment in Full under this Section 22 only if all of the following conditions are met:**

**(a) I fail to keep any promise or agreement made in this Security Instrument or the Note, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument;**

**(b) Lender sends to me, in the manner described in Section 15 of this Security Instrument, a notice that states:**

**(1) The promise or agreement that I failed to keep or the default that has occurred;**

**(2) The action that I must take to correct that default;**

**(3) A date by which I must correct the default. That date will be at least 30 days from the date on which the notice is given;**

**(4) That if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another Person may acquire the Property by means of Foreclosure and Sale;**

**(5) That if I meet the conditions stated in Section 19 of this Security Instrument, I will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security Instrument remain fully effective as if Immediate Payment in Full had never been required; and**

**(6) That I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have; and**

**(c) I do not correct the default stated in the notice from Lender by the date stated in that notice.**

**23. Lender's Obligation to Discharge this Security Instrument.** When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by Applicable Law.

**24. Agreements about New York Lien Law.** I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (a) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a trust fund; and (b) use those amounts to pay for "Cost of Improvement" (as defined in Section 13 of the New York Lien Law) before I use them for any other purpose. The fact that I am holding those amounts as a trust fund means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section 24.

**25. Borrower's Statement Regarding the Property |check box as applicable.**

[ ] This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.

[ ] This Security Instrument covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

[ ] This Security Instrument does not cover real property improved as described above.

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 17 of this Security Instrument and in any Rider signed by me and recorded with it.

Witnesses:

_____     _____ (Seal)
                                     Bobby H. J. Kim                  -Borrower

_____     _____ (Seal)
                                                                      -Borrower

_____     _____ (Seal)
                                                                      -Borrower

_____     _____ (Seal)
                                                                      -Borrower

**STATE OF NEW YORK,** New York             County ss:

On the 21st day of February, 2007 before me, the undersigned, a notary public in and for said state, personally appeared **Bobby H. J. Kim,**
personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

Tax Map Information ▓▓▓▓▓▓

KAREN MASUKO
Notary Public, State of New York
No. 01MA6012998
Qualified in New York County
Commission Expires Sept. 8, 2010

CLI BIT-G, LANCASTER (II U-G, LANCASTER) OF

# ADJUSTABLE RATE RIDER
### (LIBOR One-Year Index (As Published In *The Wall Street Journal)* - Rate Caps
### - Ten -Year Interest Only Period)

THIS ADJUSTABLE RATE RIDER is made this 21st day of **February, 2007**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **Thornburg Mortgage Home Loans, Inc, A Delaware Corporation** (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**130 BEEKMAN STREET #5B, NEW YORK, NEW YORK 10038**
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of **6.250%**. The Note provides for changes in the interest rate and the monthly payments as follows:

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
The initial fixed interest rate I will pay will change to an adjustable interest rate on the **first** day of **March, 2014**, and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."
**(B) The Index**
Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.
**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding **One and Seven-Eighths** percentage points (**1.875%**) to the Current Index. The Note Holder will then round the result of this

MULTISTATE ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Ten-Year Interest Only Period - Single Family - **Fannie Mae** UNIFORM INSTRUMENT Form 3155 2/06
198R                    Page 1 of 4

Initials: _____

addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of my monthly payment. For payment adjustments occurring before the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay all accrued interest each month on the unpaid principal balance at the new interest rate. If I make a voluntary payment of principal before the First Principal and Interest Payment Due Date, my payment amount for subsequent payments will be reduced to the amount necessary to repay all accrued interest on the reduced principal balance at the current interest rate. For payment adjustments occurring on or after the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay unpaid principal and interest that I am expected to owe in full on the Maturity Date at the current interest rate in substantially equal payments.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **11.250%** or less than **1.875%**. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than **11.250%**.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice. Date of First Principal and Interest Payment

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be that date which is the 10th anniversary date of the first payment due date, as reflected in Section 3(A) of the Note.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably

MULTISTATE ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Ten-Year Interest Only Period - Single Family - **Fannie Mae** UNIFORM INSTRUMENT                                                      Form 3155 2/06
198R                                              Page 2 of 4

Initials: ___

determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

MULTISTATE ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Ten-Year Interest Only Period - Single Family - **Fannie Mae**
UNIFORM INSTRUMENT                                                                       Form 3153 2/06
198R                                              Page 3 of 4

Initials: _____

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)        _____ (Seal)
Bobby H. J. Kim     -Borrower                            -Borrower

_____ (Seal)        _____ (Seal)
-Borrower                                  -Borrower

**MULTISTATE ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR** - Ten-Year Interest Only Period - Single Family - **Fannie Mae**
**UNIFORM INSTRUMENT**                                           **Form 3155 2/06**
**198R**                                          Page 4 of 4

# CONDOMINIUM RIDER

THIS CONDOMINIUM RIDER is made this **21st** day of **February, 2007,** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to **Thornburg Mortgage Home Loans, Inc, A Delaware Corporation** (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**130 BEEKMAN STREET #5B, NEW YORK, NEW YORK 10038**
[Property Address]

The Property includes a unit in, together with an undivided interest in the common elements of, a condominium project known as:
**The Beekman Landing Condominium**
[Name of Condominium Project]
(the "Condominium Project"). If the owners association or other entity which acts for the Condominium Project (the "Owners Association") holds title to property for the benefit or use of its members or shareholders, the Property also includes Borrower's interest in the Owners Association and the uses, proceeds and benefits of Borrower's interest.

**CONDOMINIUM COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. Condominium Obligations.** Borrower shall perform all of Borrower's obligations under the Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or any other document which creates the Condominium Project; (ii) by-laws; (iii) code of regulations; and (iv) other equivalent documents. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project which is

**MULTISTATE CONDOMINIUM RIDER**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

**Form 3140 1/01**

Page 1 of 3

Initials: _____

satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, from which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**MULTISTATE CONDOMINIUM RIDER**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

**Form 3140 1/01**

Page 2 of 3

Initials: _____ BK

**F. Remedies.** If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Condominium Rider.

_____ (Seal)
Bobby H. J. Kim                -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

**MULTISTATE CONDOMINIUM RIDER**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

**Form 3140 1/01**

Page 3 of 3

# NYC DEPARTMENT OF FINANCE
## OFFICE OF THE CITY REGISTER

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



## RECORDING AND ENDORSEMENT COVER PAGE

Document Date: 08-22-2012     Preparation Date: 08-31-2012

Document Type: ASSIGNMENT, MORTGAGE
Document Page Count: 2

| PRESENTER: | RETURN TO: |
|---|---|
| WEB TITLE AGENCY ***PICK UP*** | WEB TITLE AGENCY ***PICK UP*** |
| 500-A CANAL VIEW BLVD | 500-A CANAL VIEW BLVD |
| ROCHESTER, NY 14623 | ROCHESTER, NY 14623 |
| 585-454-4770 | 585-454-4770 |

## PROPERTY DATA

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 97 | 1118 | Entire Lot | 5B | 130 BEEKMAN STREET |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

## CROSS REFERENCE DATA

MANHATTAN **Year:** 2002   **Reel:** 3459   **Page:** 1756

x Additional Cross References on Continuation Page

## PARTIES

| ASSIGNOR/OLD LENDER: | ASSIGNEE/NEW LENDER: |
|---|---|
| MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. | U.S. BANK NATIONAL ASSOCIATION |
| 1901 E VOORHEES STREET, SUITE C | C/O SELECT PORTFOLIO SERVICING, INC., 3815 |
| DANVILLE, IL 61834 | SOUTH WEST TEMPLE |
| | SALT LAKE CITY, UT 84115 |

x Additional Parties Listed on Continuation Page

## FEES AND TAXES

| Mortgage | | | Filing Fee: | |
|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | |
| Exemption: | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 0.00 | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 0.00 | | |
| MTA: | $ | 0.00 | | |
| NYCTA: | $ | 0.00 | | |
| Additional MRT: | $ | 0.00 | | |
| TOTAL: | $ | 0.00 | | |
| Recording Fee: | $ | 53.00 | | |
| Affidavit Fee: | $ | 0.00 | | |

**RECORDED OR FILED IN THE OFFICE OF THE CITY REGISTER OF THE CITY OF NEW YORK**

Recorded/Filed     09-06-2012 14:13
City Register File No.(CRFN):
        2012000351747

*City Register Official Signature*

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 4 |
|---|---|---|

| Document Date: 08-22-2012 | Preparation Date: 08-31-2012 |
|---|---|

Document Type: ASSIGNMENT, MORTGAGE
Document Page Count: 2

| **PRESENTER:** | **RETURN TO:** |
|---|---|
| WEB TITLE AGENCY ***PICK UP*** | WEB TITLE AGENCY ***PICK UP*** |
| 500-A CANAL VIEW BLVD | 500-A CANAL VIEW BLVD |
| ROCHESTER, NY 14623 | ROCHESTER, NY 14623 |
| 585-454-4770 | 585-454-4770 |

### PROPERTY DATA

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 97 | 1118 | Entire Lot | 5B | 130 BEEKMAN STREET |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

### CROSS REFERENCE DATA

MANHATTAN Year: 2002    Reel: 3459    Page: 1756
☒ Additional Cross References on Continuation Page

### PARTIES

| ASSIGNOR/OLD LENDER: | ASSIGNEE/NEW LENDER: |
|---|---|
| MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. | U.S. BANK NATIONAL ASSOCIATION |
| 1901 E VOORHEES STREET, SUITE C | C/O SELECT PORTFOLIO SERVICING, INC., 3815 |
| DANVILLE, IL 61834 | SOUTH WEST TEMPLE |
| ☒ Additional Parties Listed on Continuation Page | SALT LAKE CITY, UT 84115 |

### FEES AND TAXES

| Mortgage | | | Filing Fee: | |
|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | |
| Exemption: | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 0.00 | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 0.00 | | |
| MTA: | $ | 0.00 | | |
| NYCTA: | $ | 0.00 | | |
| Additional MRT: | $ | 0.00 | | |
| TOTAL: | $ | 0.00 | | |
| Recording Fee: | $ | 53.00 | | |
| Affidavit Fee: | $ | 0.00 | | |



Document Date: 08-22-2012 | Preparation Date: 08-31-2012

Document Type: ASSIGNMENT, MORTGAGE

**CROSS REFERENCE DATA**
**CRFN:** 2003000480179
**CRFN:** 2005000264988
**CRFN:** 2006000161981
**CRFN:** 2006000161982
**CRFN:** 2006000242651
**CRFN:** 2007000120981
**CRFN:** 2007000120982
**CRFN:** 2007000120983

**PARTIES**
**ASSIGNOR/OLD LENDER:**
THORNBURG MORTGAGE HOME LOANS, INC
1901 E VOORHEES STREET, SUITE C
DANVILLE, IL 61834

Recording Requested By:
SELECT PORTFOLIO SERVICING, INC.


BILL KOCH
SELECT PORTFOLIO SERVICING, INC.
3815 SOUTH WEST TEMPLE
SALT LAKE CITY, UT 84115

---

## CORPORATE ASSIGNMENT OF MORTGAGE

**New York, New York   REFERENCE #** ▮▮▮▮▮▮▮ **"KIM"**
**INVESTOR #:** ▮▮▮▮
**MERS #:** ▮▮▮▮▮▮▮▮

Assignment Prepared on: August 21st, 2012.

Assignor: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., ("MERS") AS NOMINEE FOR THORNBURG MORTGAGE HOME LOANS, INC, A DELAWARE CORPORATION at 1901 E VOORHEES STREET, SUITE C, DANVILLE, IL 61834, P.O. BOX 2026, FLINT, MI 48501-2026.
Assignee: U.S. BANK NATIONAL ASSOCIATION (SUCCESSOR TO BANK OF AMERICA, N.A., SUCCESSOR BY MERGER TO LASALLE BANK N.A.), AS INDENTURE TRUSTEE, ON BEHALF OF THE HOLDERS OF THE THORNBURG MORTGAGE SECURITIES TRUST 2007-2 MORTGAGE-BACKED NOTES, SERIES 2007-2 at C/O SELECT PORTFOLIO SERVICING, INC. 3815 SOUTH WEST TEMPLE, SALT LAKE CITY, UT 84115.

Executed By: PHILIP L. LOEB  To: MORGAN STANLEY DEAN WITTER CREDIT CORPORATION
Date of Mortgage: 01/14/2002 Recorded: 02/27/2002 in Book/Reel/Liber: 3459 Page/Folio: 1756 In New York County , State of New York.

-EXTENSION AND MODIFICATION AGREEMENT Dated: 08/14/2003 Recorded: 12/01/2003 as Instrument No.: 2003000480179, between PHILIP L. LOEB and MORGAN STANLEY DEAN WITTER CREDIT CORPORATION
Loan Amount: $799,700.00

-EXTENSION AND MODIFICATION AGREEMENT Dated: 01/11/2005 Recorded: 05/06/2005 as Instrument No.: 2005000264988, between PHILIP L. LOEB and MORGAN STANLEY DEAN WITTER CREDIT CORPORATION
Loan Amount: $799,700.00

- Assigned Wholly by MORGAN STANLEY DEAN WITTER CREDIT CORPORATION  TO WASHINGTON MUTUAL BANK, FA  Dated: 12/23/2005 Recorded: 03/22/2006 as Instrument No.: 2006000161981

-New Mortgage, Dated 12/29/2005 and Recorded 03/22/2006  as Instrument No.: 2006000161982 between BOBBY HJ KIM and WASHINGTON MUTUAL BANK, FA in the amount of $512,800.00
-Mortgage Consolidation, consolidating original mortgage and the above referenced mortgage, constituting a consolidated mortgage Dated 12/29/2005 and Recorded 05/02/2006  as Instrument No.: 2006000242651 between BOBBY HJ KIM and WASHINGTON MUTUAL BANK, FA in the amount of $1,312,500.00

- Assigned Wholly by WASHINGTON MUTUAL BANK, FA TO MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR THORNBURG MORTGAGE HOME LOANS, INC. Dated: 02/09/2007 Recorded: 03/06/2007 as Instrument No.: 2007000120981

-New Mortgage, Dated 02/21/2007 and Recorded 03/06/2007  as Instrument No.: 2007000120982 between BOBBY H. J. KIM AN UNMARRIED PERSON and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR THORNBURG MORTGAGE HOME LOANS, INC, A DELAWARE CORPORATION in the amount of $229,819.15
-Mortgage Consolidation, consolidating original mortgage and the above referenced mortgage, constituting a consolidated mortgage Dated 02/21/2007 and Recorded 03/06/2007  as Instrument No.: 2007000120983 between BOBBY H. J. KIM AN UNMARRIED PERSON and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR THORNBURG MORTGAGE HOME LOANS, INC, A DELAWARE CORPORATION in the amount of $1,575,000.00

District/Section/Block/Lot: -97-1118

Property Address:  130 BEEKMAN STREET #5B, NEW YORK, NY  10038

   This Assignment is not subject to the requirements of Section 275 of the Real Property Law because it is an assignment within the secondary mortgage market.

   KNOW ALL MEN BY THESE PRESENTS that in consideration of the sum of TEN and NO/100ths DOLLARS and other good and valuable consideration, paid to the above named Assignor, the receipt and sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Mortgage together with other evidence of indebtedness, said Mortgage having an original principal sum of $799,700.00 with interest, secured thereby, together with all moneys now owing or that may hereafter become due or owing in respect thereof, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's beneficial interest under the Mortgage.

   TO HAVE AND TO HOLD the said Mortgage, and also the said property unto the said Assignee forever, subject to the terms contained in said Mortgage.  IN WITNESS WHEREOF, the assignor has executed these presents the day and year first above written:

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., ("MERS")
On ___AUG 2 2 2012___

By: _____
BILL KOCH, ASSISTANT SECRETARY

STATE OF UTAH
COUNTY OF SALT LAKE

On ___AUG 2 2 2012___, before me, MARCO AURELIO VILLAGRAN, a Notary Public in and for SALT LAKE in the State of UTAH, personally appeared BILL KOCH, ASSISTANT SECRETARY, signing on behalf of Mortgage Electronic Registration Systems, inc., ("MERS"), personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument, and that such individuals(s) made such appearance before the undersigned in the County of SALT LAKE, State of UTAH.

WITNESS my hand and official seal,

MARCO AURELIO VILLAGRAN
Notary Expires: 01/20/2016  #652139
Salt Lake, Utah

Marco Aurelio Villagran
Notary Public  State of Utah
My Commission Expires on:
January 20, 2016
Comm. Number: 652139

(This area for notarial seal)



Thornburg Mortgage Home Loans, Inc.                                      Loan #
Attn: Special Products Dept.
425 Phillips Blvd.
Ewing, NJ 08618

# LOAN MODIFICATION AGREEMENT
### (Providing for Adjustable Rate Note)

This Loan Modification Agreement ("Agreement"), made this **April 1, 2009** between **Bobby H. J. Kim** ("Borrowers") and **Thornburg Mortgage Home Loans, Inc.** ("Lender"), amends and supplements (1) the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated **February 21, 2007** and recorded or to be recorded in the New York Office of the Register of Deeds of the city of New York, New York and (2) the Note, bearing the same date as and secured by, the Security Instrument, which covers the real and personal property described in the Security Instrument and defined therein as the "Property", located at **130 Beekman Street #5B, New York, NY, 10038**, the real property described being set forth as follows:

**See Exhibit "A" attached**

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1.  As of **April 1, 2009**, the amount payable under the Note and Security Instrument (the Unpaid Principal Balance") is U.S. **$1,583,167.78**, consisting of the unpaid amount(s) loaned to Borrowers by Lender plus any interest and other amounts capitalized.

2.  Borrowers promise to pay the Unpaid Principal Balance, plus interest, to the order of Lender. Interest will be charged on the Unpaid Principal Balance at the yearly rate of **2%**, effective **April 1, 2009**. Borrowers promise to make interest-only payments in the amount of U.S. **$2,638.61**, beginning on the first day of **May, 2009**, and continuing thereafter on the same day of each succeeding month for the next three (**3**) months. Effective with the payment due **August 1, 2009**, the interest rate will revert back to **6.25%** which was the rate in effect prior to the modification and interest will be charged on the modified Principal Balance of **$1,599,860.77**. The ARM terms of the Note will remain unchanged with the next scheduled interest rate change date of **March 1, 2014** effective with the **April 1, 2014** payment and every 12 months thereafter. If on **March 1, 2037** (the "Maturity Date"), Borrowers still owe amounts under the Note and Security Instrument, as amended by this Agreement, Borrowers will pay these amounts in full on the Maturity Date.
    The Borrowers will make such payments at:

    **Thornburg Mortgage Home Loans, Inc.**
    425 Phillips Blvd.
    Ewing, NJ 08618

3.  If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrowers are not natural persons and a beneficial interest in Borrowers is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument. If Lender exercises this option, Lender shall give Borrowers notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrowers must pay all sums secured by the Security Instrument. If Borrowers fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument, without further notice or demand on Borrower.

4. If properties are sold in the future, any proceeds in excess of the payoff of our mortgage and ancillary closing costs would be used to pay down the loss of interest we are incurring during the workout period.

5. No additional subordinated financing will be allowed on the property without permission from Thornburg Mortgage.

6. Borrowers also will comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, Borrowers' covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that Borrowers are obligated to make under the Security Instrument

7. Borrowers understand and agree that:

   a) All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.

   b) All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the Borrowers' obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on the Note and Security Instrument are expressly reserved by Lender.

   c) Borrowers have no right of set-off or counterclaim, or any defense to the obligations of the Note or Security Instrument.

   d) Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

   e) All costs and expenses incurred by Lender in connection with this Agreement, including recording fees, title examination, and attorney's fees, shall be paid by the Borrowers and shall be secured by the Security Instrument, unless stipulated otherwise by Lender.

   f) Borrowers agree to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrowers.

_____ (Seal)
-Lender

By: _____
Mark Kilbaugh, Authorized Representative

_____ (Seal)
Bobby H. J. Khan

_____ (Seal)

_____ [Space Below This Line For Acknowledgements] ___ __ __ __ __ ___ ___ _

STATE OF _*NEW YORK*_ ) SS:
COUNTY OF _*QUEENS*_ )

    **BE IT REMEMBERED THAT**, on this _24_ day of _*APRIL*_ , 2009, before me, the subscriber named below, personally appeared **Bobby H. J. Kim** who, being by me duly sworn on his/her oath, deposed and made proof to my satisfaction that he/she is the person named in and who executed the within instrument; and I having first made known to him/her the contents thereof, he/she did acknowledge that he/she signed, sealed, and delivered the same as his/her voluntary act and deed, for the uses and purposes therein expressed.

                                 Notary Public

                                        CLAUDIA GAGA
                           Notary Public, State of New York
                                 No. 01GA6154854
                               Qualified in Queens County
                       Commission Expires October 23, 2010

STATE OF _*New Jersey*_ ) SS:
COUNTY OF _*Mercer*_ )

    The foregoing instrument is hereby acknowledged before me this _06th_ day of _*July*_ , 2009 by **Mark Kelbaugh**, an Authorized Representative of **Thornburg Mortgage Home Loans, Inc.** on behalf of the corporation, who, I am satisfied, is the person who signed the foregoing instrument; and he/she did acknowledge that he/she signed and delivered the same in his/her capacity as such officer and that the foregoing instrument is the voluntary act and deed of such corporation, made by virtue of the authority of its board of directors.

                                   Notary Public

ZAREEN R. WAQIF
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Sept. 06, 2010

## SCHEDULE A

The Condominium Unit (hereinafter referred to as "Unit") in the building known as The Beekman Landing Condominium (hereinafter referred to as the "Building") and by the street number 130 Beekman Street a/k/a 227, 229 and 231 Water Street, New York, N.Y., Borough of Manhattan, County of New York, City and State of New York, said Unit being designated and described as the Unit 5B in a certain Declaration made pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act"), establishing a plan for condominium ownership of the Building and the land upon which the Building is situate (hereinafter referred to as the "Land"), which Declaration was dated August 8, 2001 and recorded on December 7, 2001 in the New York Office of the Register of the City of New York in Reel 3405 Page 199, as amended by the First Amendment to the Declaration dated as of December 18, 2001 and recorded on December 20, 2001 in the New York County Office of the Register of the City of New York in Reel 3413 Page 1537 (which Declaration and Amendment thereto are hereinafter collectively referred to the "Declaration"). The Unit is also designated as Tax Lot 1118 in Block 97 of Section 1 of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City of New York and on the Floor Plans of the Building, certified by Simon Schwarz Associates on December 5, 2001, and filed with Real Property Assessment Department of the City of New York on December 7, 2001, as Condominium Plan 1218 and also filed in the City Register's Office on December 7, 2001 as Map No. 5850.

TOGETHER with the 7.51 percent undivided interest in the Common Elements, as such term is defined in the Declaration;

The Land upon which the Building containing the Unit is situate is more particularly bounded and described as follows:

PARCEL A:

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly side of Water Street, distant 50 feet 1 inch easterly from the corner formed by the intersection of the said southerly side of Water Street and the easterly side of Beekman Street;

THENCE easterly along said southerly side of Water Street, 16 feet 6 inches to a point opposite the centre line of a party wall;

THENCE southerly along the centre line of said party wall and a line in continuation thereof, 72 feet 10-1/2 inches to the centre line of the block;

THENCE westerly along the said centre line of the block, 16 feet 7 inches to the easterly face of the independent wall of the building upon the premises adjoining the same on the west;

THENCE northerly along the easterly face of the said last mentioned wall, 13 feet 4-3/4 inches to the southerly face of the rear wall of the building upon the premises herein described;

THENCE westerly along the southerly face of the said last mentioned wall, 2 inches to a point in the centre of the 24 inch wall standing between the building on the premises herein described and the building upon the premises adjoining on the west; and

THENCE northerly along the centre line of the said last mentioned wall, 59 feet 6 inches to the southerly side of Water Street, the point or place of BEGINNING.

Date Printed January 18, 2007

### SCHEDULE A - continued

PARCEL B:

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northeasterly side of Beekman Street with the southeasterly side of Water Street;

RUNNING THENCE northeasterly along the southeasterly side of Water Street, 24 feet 9 inches to a point in the center or in a line in continuation of the center of 12 inch wall standing half on the premises herein described and half on the premises adjoining on the northeast;

THENCE southeasterly along a line in continuation of the center and along the center of said 12 inch wall and along the southwesterly face of southwesterly wall of the six-story brick building on the premises described in Schedule A, 54 feet 4 inches to the northwesterly face of the northwesterly wall of the brick building on the premises known as 134 Beekman Street;

THENCE southwesterly along the northwesterly face of said northwesterly wall, 25 feet 6 inches to the northeasterly side of Beekman Street; and

THENCE northwesterly along the northeasterly side of Beekman Street, 53 feet 10 inches to the corner, the point or place of BEGINNING.

**Date Printed** January 18, 2007

## SCHEDULE A - continued

**PARCEL C:**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at a point on the southeasterly side of Water Street, distant 24 feet 9 inches northeasterly from the corner formed by the intersection of the northeasterly side of Beekman Street with the southeasterly side of Water Street;

RUNNING THENCE northeasterly along the southeasterly side of Water Street, 25 feet 4 inches to a point in the center or in a line in continuation of the center of a 24 inch wall standing half on the premises herein described and half on the premises adjoining on the northeast;

THENCE southeasterly along a line in continuation of the center and along the center of said 24 inch wall and along the northeasterly face of the northeasterly wall of the six story brick building and of the one story brick building on the premises described in Schedule A, 93 feet 4 inches to the southeasterly face of the southeasterly wall of said one story brick building on the premises described in Schedule A,

THENCE southwesterly along said southeasterly face of said southeasterly wall, 25 feet 4-1/2 inches to the southwesterly face of the southwesterly wall of said one story brick building;

THENCE northwesterly along said southwesterly face of said southwesterly wall of said one story brick building and along the southwesterly face of the southwesterly wall of the six story brick building on the premises described in Schedule A and through the center of a party wall, 92 feet 9 inches to the southeasterly side of Water Street, the point or place of BEGINNING.

*For conveyancing only,*
*if intended to be conveyed.*

Together with all right, title and interest of, in and to any streets and roads abutting the above described premises, to the center line thereof.

Date Printed January 18, 2007

# Exhibit "B"

FA 6/11/18
E

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

**PRESENT:** Hon. Judith N. McMahon
J.S.C.                                                    **PART** _____

_stice_

Index Number : 810144/2012
U.S. BANK, N.A.                                           **INDEX NO.** _____
vs
KIM,BOBBY H.J.                                           **MOTION DATE** _____
Sequence Number : 004
JUDGMENT OF FORECLOSURE & SALE                          **MOTION SEQ. NO.** _____

The following papers, numbered 1 to _____ , were read on this motion to/for _____

Notice of Motion/Order to Show Cause — Affidavits — Exhibits   _____ | No(s). _____

Answering Affidavits — Exhibits _____ | No(s). _____

Replying Affidavits _____ | No(s). _____

Upon the foregoing papers, it is ordered that this motion is

*Motion granted in accordance with the attached order.*

RECEIVED
JUN 0 8 2018
NYS SUPREME COURT CIVIL
GENERAL CLERK'S OFFICE

FILED
JUN 2 2 2018
COUNTY CLERK'S OFFICE
NEW YORK

Dated: 5/29/18                                           _____, J.S.C.
                                                         Hon. Judith N. McMahon
                                                         J.S.C.

**MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):**

1. CHECK ONE: ............................................ ☑ CASE DISPOSED        ☐ NON-FINAL DISPOSITION
2. CHECK AS APPROPRIATE: ...................MOTION IS: ☑ GRANTED  ☐ DENIED  ☐ GRANTED IN PART  ☐ OTHER
3. CHECK IF APPROPRIATE: ................................ ☐ SETTLE ORDER        ☐ SUBMIT ORDER
                                                         ☐ DO NOT POST  ☐ FIDUCIARY APPOINTMENT  ☐ REFERENCE



At Part        of the Supreme Court of the
State of New York held in and for the
County of New York, at the Courthouse
thereof, at New York, New York, on
May 29, 2018 , 2011.

Present: Hon. , J.S.C.    Hon. Judith N. McMahon
                          J.S.C.

# ORIGINAL

---

U.S. Bank National Association (successor to Bank of
America, N.A., successor by merger to LaSalle Bank N.A.),
as Indenture Trustee, on behalf of the holders of the
Thornburg Mortgage Securities Trust 2007-2 Mortgage-
Backed Notes, Series 2007-2,

Plaintiff,

-against-

Bobby H.J. Kim; JPMorgan Chase Bank, N.A.; The Board of
Managers of Beekman Landing Condominium Homeowners
Association; New York State Department of Taxation and
Finance; City of New York Environmental Control Board;
City of New York Parking Violations Bureau; City of New
York Transit Adjudication Bureau; Inwood Country Club,

Defendants.

**JUDGMENT OF**
**FORECLOSURE AND**
**SALE**

Index No. 810144/12

Our File No.: 12-019290

# FILED

JUN 2 2 2018
COUNTY CLERK'S OFFICE
NEW YORK

Premises:
130 Beekman Street 5b
New York, NY 10038

**Block 97 Lot 1118**

---

**ON** the Summons, Complaint and Notice of Pendency duly filed in this action on

October 2, 2012, on the Additional Notice of Pendency filed on August 25, 2015, and all

proceedings thereon; and on reading and filing the Notice of Motion dated August 15 , 2017 and

Affirmation of Regularity of Alexander Phengsiaroun, Esq. dated August 15 , 2017, with

exhibits annexed thereto, showing that all Defendant(s) were duly served pursuant to the laws of

the  State of New York with a copy of the Summons in this action, or have voluntarily appeared

by their respective attorneys; and on the proof of service upon and appearance, if any, by the

Defendant(s) herein heretofore filed in this action; and stating that more than the legally required

number of days have elapsed since said Defendant(s) were so served; and that none of the

12-019290                    Judgment of Foreclosure and Sale

Defendant(s) have served an answer to said Complaint, nor has their time to do so been extended; and

ON the Order of Reference made and entered on February 26, 2016, appointing Alan M. Levin, Esq. as Referee in this action to ascertain and compute the amount due, and to examine the Plaintiff or its agent on oath as to the allegations of the complaint, and to examine and report whether the mortgaged premises should be sold in one or more parcels;

AND on reading and filing of the oath and report of the aforesaid Referee sworn to and dated August 18, 2016, it appears that the sum of $2,223,564.05 was due the Plaintiff, as of March 31, 2016, plus a per diem interest for every day thereafter, on the date of said Report and that the mortgaged premises should be sold in one parcel.

NOW, on motion of Shapiro, DiCaro & Barak, LLC, the attorneys for the Plaintiff, it is

ORDERED, that the motion is granted and it is further

ORDERED, ADJUDGED AND DECREED that the report of Alan M. Levin, Esq. dated August 18, 2016, be, and the same is hereby, in all respects, ratified and confirmed; and it is further

ORDERED, ADJUDGED AND DECREED that by accepting this appointment the referee certifies that they are in compliance with Part 36 of the Rules of the Chief Judge (22 NYCRR Part 36), including, but not limited to, § 36.2(c) ("Disqualifications from appointment"), and § 36.2 (d) ("Limitations on appointments based upon compensation"); and it is further

ORDERED, ADJUDGED, AND DECREED that the mortgaged premises (Block 97 Lot 1118) as further described in the complaint in this action and hereinafter described, or such part thereof as may be sufficient to discharge the mortgage debt under the note and mortgage, the expenses of the sale and the costs of this action as provided by the Real Property Actions and Proceeding Law be sold, in one parcel, at public auction on a Wednesday at 2:00 P.M. at 60

Centre Street, Room 130, New York , within ninety (90) days of the entry of this Judgment by and under the direction of Alan M. Levin, Esq., who is hereby appointed Referee for that purpose; that said Referee give public notice of the time and place of such sale in accordance with law, practice of this Court and RPAPL § 231 in ___NY Law Journal___ and that the Plaintiff or any other party to this action may become the purchaser at such sale; that in case the plaintiff shall become the purchaser at the said sale, they shall not be required to make any deposit thereon; that said Referee execute to the purchaser or purchasers on such sale a deed of the premises sold; that in the event a party other than the plaintiff becomes the purchaser or purchasers at such sale they shall be required to tender a deposit of 10% of the purchase price in certified funds and that all deed stamps, transfer taxes and recording fees, if any, shall be paid by the purchaser, and the closing of title shall be had thirty days after such sale unless otherwise stipulated by all parties to the sale and if such closing is required, and the Referee seeks and is awarded additional fees for said closing, those fees shall be paid by purchaser; and it is further,

**ORDERED, ADJUDGED AND DECREED,** that said Referee on receiving the proceeds of the sale, shall forthwith pay therefrom, in accordance with their priority according to law, the taxes, assessments, sewer rents or water rates which are or may become liens on the premises at the time of sale with such interest or penalties which may have lawfully accrued thereon to the date of payment; and it is further,

**ORDERED, ADJUDGED AND DECREED,** that said Referee then deposit the balance of said proceeds of sale in his/her own name as Referee in ___Citibank 2 Mott Street NY NY 10013___ and shall thereafter make the following payments and his/her checks drawn for that purpose shall be paid by said depository;

**FIRST:** That statutory fees of the Referee in the sum of $500.00.

**SECOND:** The expenses of sale and the advertising expenses as shown on the bills presented and certified by said Referee to be correct, duplicate copies of

12-019290  Judgment of Foreclosure and Sale

which shall be annexed to the report of sale and filed with said Depository and Clerk of this Court.

**THIRD:** Said Referee shall also pay to the plaintiff or plaintiff's attorney, the sum of $2,456.00 to be determined by the Clerk and adjudged to the Plaintiff for costs and disbursements in this action or as taxed by the Clerk on the Costs of Plaintiff and inserted therein, with interest thereon from the date hereof; together with reasonable attorneys' fees in the sum of $4,950.00 as provided for in paragraph 22 of the mortgage, and also the sum of $2,223,564.05 the said amount so reported due as aforesaid, together with contractual interest thereon from March 31, 2016, the date interest was calculated to in said report to the date of entry of the Judgment and legal interest thereafter, or so much thereof as the purchase money of the mortgaged premises will pay of the same, together with any advances necessarily paid by the Plaintiff for taxes, fire insurance, principal and interest to prior mortgages to preserve and or maintain the premises not previously included in any computations, said expenses being substantiated by proper receipts therefore.

**FOURTH:** If such Referee intends to apply for a further allowance for fees, an application shall be made to the court therefore upon due notice to those parties entitled thereto.

That in case the plaintiff be the purchaser of said mortgaged premises at said sale, or in the event that the rights of the purchasers at said sale and the terms of sale under the judgment shall be assigned to and be acquired by the plaintiff, and a valid assignment thereof filed with said Referee, said Referee shall not require the plaintiff to pay in cash the entire amount bid at said sale, but shall execute and deliver to the plaintiff or its assignee, a deed or deeds of the

12-019290                                  Judgment of Foreclosure and Sale

premises sold upon the payment to said Referee of the amount specified above in items marked **"FIRST"** and **"SECOND"** and the amounts of the aforesaid taxes, assessments, sewer rents and water rates, with interest and penalties thereon, or in lieu of the payment of said last mentioned amounts, upon filing with said Referee receipts of the proper municipal authorities showing payment thereof; that the balance of the amount bid, after deducting therefrom the aforesaid amounts paid by the plaintiff for Referee's fees, advertising expenses, taxes, assessments, sewer rents and water rates shall be allowed to the Plaintiff and applied by said Referee upon the amounts due to the plaintiff as specified in item marked **"THIRD"**; that if after so applying the balance of the amount bid, there shall be a surplus over and above the said amounts due to the plaintiff, the plaintiff shall pay to the said Referee, upon delivery to plaintiff of said Referee's deed, the amount of such surplus; that said Referee on receiving said several amounts from the plaintiff shall forthwith pay therefrom said taxes, assessments, sewer rents, water rates, with interest and penalties thereon, unless the same have already been paid, and shall then deposit the balance in the hereinbefore designated Depository.

The said Referee shall take the receipt of the Plaintiff or the attorneys for the Plaintiff for the amounts paid as directed in item **"THIRD"** above, and file it with the report of sale; that surplus monies be deposited, if any, with the New York County Clerk within five days after the same shall be received and be ascertainable, to the credit of this action, to be withdrawn only on an order of this Court, signed by a Justice of this Court. The Referee shall make the report of such sale under oath showing the disposition of the proceeds of the sale and accompanied by the vouchers of the persons to whom payments were made, and shall file it with the New York County Clerk within thirty days after completing the sale and executing the proper conveyance to the purchaser and that if the proceeds of such sale be insufficient to pay the amount reported due to the Plaintiff with interest and costs as aforesaid, the Plaintiff shall recover from the Defendant(s), Bobby H.J. Kim, unless discharged in bankruptcy, the whole deficiency or so much

12-019290                    Judgment of Foreclosure and Sale

thereof as this Court may determine to be just and equitable of the residue of the mortgage debt remaining unsatisfied after a sale of the mortgaged premises and the application of the proceeds thereof, provided a motion for a deficiency judgment shall be made as prescribed by § 1371 of the Real Property Actions and Proceedings Law within the time limited therein, and the amount thereof if determined and awarded by an Order of this Court as provided for in said section; and it is further

**ORDERED, ADJUDGED AND DECREED** that each and all of the Defendant(s) in this action and all persons claiming under them, or any or either of them, after the filing of such notice of pendency of this action, be and they are hereby forever barred and foreclosed of all right, claim, lien, title, interest, and equity of redemption in said mortgaged premises and each and every part thereof; and it is further

**ORDERED, ADJUDGED AND DECREED**, that said premises is to be sold in one parcel in "as is" physical order and condition, subject to any state of facts that an inspection of the premises would disclose; any state of facts than an accurate survey of the premises would show, any covenants, restrictions, declarations, reservations, easements, rights of way and public utility agreement of record, if any; any building and zoning ordinances of the municipality in which the mortgaged premises is located and possible violations of same; any rights of tenants or persons in possession of the subject premises; prior lien(s) of record, if any, except those liens addressed in § 1354 of the Real Property Actions and Proceeding Law; any equity of redemption of the UNITED STATES OF AMERICA to redeem the premises within 120 days from date of sale; and it is further; and it is further

**ORDERED**, that a copy of this Judgment with Notice of Entry shall be served upon the Referee in this matter, the **owner of the equity of redemption**, any **tenants** named in this action and any other party entitled to notice.

12-019290                    Judgment of Foreclosure and Sale

**ORDERED, ADJUDGED AND DECREED**, that transfer tax is not a lien upon the Property or an expense of sale, but rather an expense of recording the deed. All expenses of recording the Referee's Deed shall be paid by the purchaser and not the Referee from sale proceeds.

**ORDERED, ADJUDGED AND DECREED**, that for purposes of statutory compliance with RPAPL 1351(1), the date of the Judgment of Foreclosure and Sale shall be deemed to be the date of entry of the Judgment of Foreclosure and Sale.

Said premises commonly known as 130 Beekman Street 5b, New York, NY 10038. A description of said mortgaged premises is annexed hereto and made a part hereof as Schedule A.

[INTENTIONALLY BLANK]

Attorney certification pursuant
to 22NYCRR § 130-1.1-a
is affixed to inside cover.

12-019290                                    Judgment of Foreclosure and Sale

AND IT IS FURTHER

ORDERED that unless the adjournment of the sale is at the referee's request, any adjournment made with less than 48 hours of notice shall require an additional fee to the referee of $250 for each and every such adjournment without any further Court order necessary, and it is further

ORDERED that, without further order of the Court, the referee shall be entitled to an additional fee of $950 for conducting and attending a closing with a purchaser other than plaintiff, plus, if such a closing is scheduled for the referee's conference room, then the referee shall be entitled to a reasonable fee for use thereof, also without further order of the Court and it is further

ORDERED that the referee need not conduct the sale unless plaintiff shall provide the referee with proof of publication of the notice of sale, and if the sale is adjourned due to plaintiff's failure to provide such proof, then said adjournment shall not be considered at the referee's request;

ORDERED that plaintiff shall serve this order on the appropriate court clerks and the county clerk so they may amend the caption as set forth herein in their records.

A description of the premises is annexed hereto as exhibit A.

E-MAIL PGOLONKA@NYCOURTS.GOV
WITHIN 60 DAYS OF THE DATE OF THIS
ORDER TO SCHEDULE THE SALE

New York, New York
Date: 5|29|18

Judith N. McMahon
Justice of the Supreme Court

Hon. Judith N. McMahon
J.S.C.

**FILED**

JUN 2 2 2018
COUNTY CLERK'S OFFICE
NEW YORK

Clerk

# SCHEDULE A
## DESCRIPTION OF MORTGAGED PREMISES

Title No. ████████████

The Condominium Unit (hereinafter referred to as "Unit") in the building known as The Beekman Landing Condominium (hereinafter referred to as the "Building") and by the street number 130 Beckman Street a/k/a 227, 229 and 231 Water Street, New York, N.Y., Borough of Manhattan, County of New York, City and State of New York, said Unit being designated and described as the Unit 5B in a certain Declaration made pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act"), establishing a plan for condominium ownership of the Building and the land upon which the Building is situate (hereinafter referred to as the "Land"), which Declaration was dated August 8, 2001 and recorded on December 7, 2001 in the New York Office of the Register of the City of New York in Reel 3405 Page 199, as amended by the First Amendment to the Declaration dated as of December 18, 2001 and recorded on December 20, 2001 in the New York County Office of the Register of the City of New York in Reel 3413 Page 1537 (which Declaration and Amendment thereto are hereinafter collectively referred to the "Declaration"). The Unit is also designated as Tax Lot 1118 in Block 97 of Section 1 of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City of New York and on the Floor Plans of the Building, certified by Simon Schwarz Associates on December 5, 2001, and filed with Real Property Assessment Department of the City of New York on December 7, 2001, as Condominium Plan 1218 and also filed in the City Register's Office on December 7, 2001 as Map No. 5850.

TOGETHER with the 7.51 percent undivided interest in the Common Elements, as such term is defined in the Declaration;

The Land upon which the Building containing the Unit is situate is more particularly bounded and described as follows:

PARCEL A:

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly side of Water Street, distant 50 feet 1 inch easterly from the corner formed by the intersection of the said southerly side of Water Street and the easterly side of Beekman Street;

THENCE easterly along said southerly side of Water Street, 16 feet 6 inches to a point opposite the centre line of a party wall;

THENCE southerly along the centre line of said party wall and a line in continuation thereof, 72 feet 10-1/2 inches to the centre line of the block;

THENCE westerly along the said centre line of the block, 16 feet 7 inches to the easterly face of the independent wall of the building upon the premises adjoining the same on the west;

THENCE northerly along the easterly face of the said last mentioned wall, 13 feet 4-3/4 inches to the southerly face of the rear wall of the building upon the premises herein described;

THENCE westerly along the southerly face of the said last mentioned wall, 2 inches to a point in the centre of the 24 inch wall standing between the building on the premises herein described and the building upon the premises adjoining on the west; and

THENCE northerly along the centre line of the said last mentioned wall, 59 feet 6 inches to the southerly side of Water Street, the point or place of BEGINNING.

## -CONTINUED-

## SCHEDULE A – CONTINUED
## DESCRIPTION OF MORTGAGED PREMISES

Title No.: ████████████████████

**PARCEL B:**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northeasterly side of Beekman Street with the southeasterly side of Water Street;

RUNNING THENCE northeasterly along the southeasterly side of Water Street, 24 feet 9 inches to a point in the center or in a line in continuation of the center of 12 inch wall standing half on the premises herein described and half on the premises adjoining on the northeast;

THENCE southeasterly along a line in continuation of the center and along the center of said 12 inch wall and along the southwesterly face of southwesterly wall of the six-story brick building on the premises described in Schedule A, 54 feet 4 inches to the northwesterly face of the northwesterly wall of the brick building on the premises known as 134 Beekman Street;

THENCE southwesterly along the northwesterly face of said northwesterly wall, 25 feet 6 inches to the northeasterly side of Beekman Street; and

THENCE northwesterly along the northeasterly side of Beekman Street, 53 feet 10 inches to the corner, the point or place of BEGINNING.

·CONTINUED·

# SCHEDULE A – CONTINUED
## DESCRIPTION OF MORTGAGED PREMISES

Title No.:

### PARCEL C:

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County, City and State of New York, bounded and described as follows:

BEGINNING at a point on the southeasterly side of Water Street, distant 24 feet 9 inches northeasterly from the corner formed by the intersection of the northeasterly side of Beekman Street with the southeasterly side of Water Street;

RUNNING THENCE northeasterly along the southeasterly side of Water Street, 25 feet 4 inches to a point in the center or in a line in continuation of the center of a 24 inch wall standing half on the premises herein described and half on the premises adjoining on the northeast;

THENCE southeasterly along a line in continuation of the center and along the center of said 24 inch wall and along the northeasterly face of the northeasterly wall of the six story brick building and of the one story brick building on the premises described in Schedule A, 93 feet 4 inches to the southeasterly face of the southeasterly wall of said one story brick building on the premises described in Schedule A;

THENCE southwesterly along said southeasterly face of said southeasterly wall, 25 feet 4-1/2 inches to the southwesterly face of the southwesterly wall of said one story brick building;

THENCE northwesterly along said southwesterly face of said southwesterly wall of said one story brick building and along the southwesterly face of the southwesterly wall of the six story brick building on the premises described in Schedule A and through the center of a party wall, 92 feet 9 inches to the southeasterly side of Water Street, the point or place of BEGINNING.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

U.S. Bank National Association (successor to Bank of America, N.A., successor by merger to LaSalle Bank N.A.), as Indenture Trustee, on behalf of the holders of the Thornburg Mortgage Securities Trust 2007-2 Mortgage-Backed Notes, Series 2007-2,

**COSTS OF PLAINTIFF**

Plaintiff,

Index No.810144/12

-against-

Bobby H.J. Kim, et al,

Defendants.

**COSTS OF PLAINTIFF:**

| | |
|---|---|
| Costs before note of issue | $200.00 |
| CPLR Sec. 8201 subd.1 | |
| Allowance by statute | 150.00 |
| CPLR Sec. 8302 (a) (b) | |
| Additional allowance | 50.00 |
| CPLR Sec. 8302 (d) | |
| Motion costs | 0.00 |
| CPLR Sec 8302 | |
| Costs: | **$400.00** |

**DISBURSEMENTS:**

| | |
|---|---|
| Fee for index number | $400.00 |
| CPLR Sec. 8018 (a) | |
| Referee's fee | 50.00 |
| CPLR Sec. 8301(a)1 | |
| Clerk's fee, filing notice of pend. or attach. | 70.00 |
| CPLR Sec. 8021 (a)(10) | |
| Paid for searches | 561.00 |
| CPLR Sec. 8301(a)1 | |
| Serving copy summons & complaint | 880.00 |
| CPLR Sec. 8011(c)1 | |
| Request for Judicial Intervention | 95.00 |
| CPLR Sec. 8020(a) | |
| Fees for publication | 0.00 |
| CPLR sec. 8301(a)3 | |
| Disbursements: | **2,056.00** |
| Total Costs and Disbursements: | **$2,456.00** |

**FILED**

JUN 2 2 2018

COUNTY CLERK'S OFFICE
NEW YORK

I HEREBY CERTIFY THAT I HAVE ADJUSTED THIS BILL OF COSTS A
$ 2456.00

JUN 2 2 2018

_Milton A Tingling_
CLERK

Alexander Phengsiaroun, Esq.
Associate Attorney
SHAPIRO, DICARO & BARAK, LLC
Attorneys for Plaintiff
175 Mile Crossing Boulevard
Rochester, New York 14624
(585) 247-9000
Fax: (585) 247-7380

## ATTORNEY'S AFFIRMATION

I, Alexander Phengsiaroun, an attorney admitted to the practice of law in the State of New York, hereby affirm pursuant to CPLR §2106 that: Shapiro, DiCaro & Barak, LLC, are the attorneys of record for the Plaintiff in this action; the foregoing disbursements have been or will be necessarily made or incurred in this action and are reasonable in amount; and the copies of the documents or papers as charged herein were actually and necessarily obtained for use.

Dated: _____08\15\17_____

Alexander Phengsiaroun, Esq.
Associate Attorney
SHAPIRO, DICARO & BARAK, LLC
Attorneys for Plaintiff
175 Mile Crossing Boulevard
Rochester, New York 14624
(585) 247-9000
Fax: (585) 247-7380

**FILED**

JUN 22 2018
COUNTY CLERK'S OFFICE
NEW YORK

## ATTORNEY'S CERTIFICATION

I, Alexander Phengsiaroun, am an attorney duly admitted to the practice of law in the State of New York. I am an associate of Shapiro, DiCaro & Barak, LLC, the attorneys for the Plaintiff, U.S. Bank National Association (successor to Bank of America, N.A., successor by merger to LaSalle Bank N.A.), as Indenture Trustee, on behalf of the holders of the Thornburg Mortgage Securities Trust 2007-2 Mortgage-Backed Notes, Series 2007-2, in the above captioned civil action.

I HEREBY CERTIFY, pursuant to §130-1.1-a of the Rules of the Chief Administrator (22 NYCRR), to the best of my knowledge, information and belief, formed after an inquiry reasonable under the circumstances, that the presentation of the papers in this action checked below, or the contentions therein, are not frivolous as defined in subsection (c) of §130-1.1 of the Rules of the Chief Administrator (22NYCRR):

{ } Summons & Complaint

{ } Answer or Reply

{ } Attorney's Affirmations

{X} Other: Judgment of Foreclosure and Sale

Dated: _____ 6 8\15\17 _____

**FILED**

ꓞUN 2 2 2018
COUNTY CLERK'S OFFICE
NEW YORK

Alexander Phengsiaroun, Esq.
Associate Attorney
SHAPIRO, DICARO & BARAK, LLC
Attorneys for Plaintiff
175 Mile Crossing Boulevard
Rochester, New York 14624
(585) 247-9000
Fax: (585) 247-7380

12-019290

SUPREME COURT
OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

INDEX NO. 810144/12

U.S. Bank National Association
(successor to Bank of America, N.A.,
successor by merger to LaSalle Bank
N.A.), as Indenture Trustee, on behalf of
the holders of the Thornburg Mortgage
Securities Trust 2007-2 Mortgage-Backed
Notes, Series 2007-2,

Plaintiff,

-VS-

Bobby H.J. Kim, et al.,

Defendant(s).

JUDGMENT OF FORECLOSURE
AND SALE

SHAPIRO, DICARO & BARAK, LLC
175 MILE CROSSING BOULEVARD
ROCHESTER, NEW YORK 14624
(585) 247-9000

FILED

JUN 2 2 2018
AT 12:49 PM
N.Y. CO. CLK'S OFFICE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Index # 810144/12

U.S. Bank National Association (successor to Bank of America, N.A.,
successor by merger to LaSalle Bank N.A.), as Indenture Trustee, on
behalf of the holders of the Thornburg Mortgage Securities Trust 2007-2
Mortgage-Backed Notes, Series 2007-2

Plaintiff

-against-

AFFIDAVIT OF SERVICE
BY MAIL

Bobby H.J. Kim; JPMorgan Chase Bank, N.A.; The Board of Managers of
Beekman Landing Condominium Homeowners Association; New York
State Department of Taxation and Finance; City of New York
Environmental Control Board; City of New York Parking Violations
Bureau; City of New York Transit Adjudication Bureau; Inwood Country
Club

Defendant(s)

**STATE OF NEW YORK)**
**COUNTY OF MONROE) ss.:**

I, Allyson Keuvelaar, being sworn, say: I am not a party to this action; I am over 18 years of age, I

reside in Rochester, New York.

On January 13, 2020, I served a Notice of Sale on the following:

Alan M. Levin, Esq.
26 Court Street
Suite 1309
Brooklyn, NY 11242

Bobby H.J. Kim a/k/a Bobby H. Kim a/k/a Bobby J. Kim a/k/a Bobby Kim
130 Beekman Street 5b
New York, NY 10038

JPMorgan Chase Bank, N.A.
c/o CT Corp.
111 Eighth Avenue
New York, NY 10011

The Board of Managers of Beekman Landing Condominium Homeowners Association
c/o Siren Management
40 Exchange Place
New York, NY 10005

Charles E. Gary, Esq.
*Attorney for defendant New York State Department of Taxation and Finance*
300 Motor Parkway
Suite 125
Hauppauge, NY 11788-5522

Levy, Davis & Maher, LLP
39 Broadway
Suite 1620
New York, NY 10006

Stephen W. O'Connell, Esq.
Smith, Gambrell & Russell, LLP
*Attorney for defendant The Board of Managers of Beekman Landing Condominium Homeowners Association*
1301 Avenue of the Americas
21st Floor
New York, NY 10019

Current Occupant
130 Beekman Street 5b
New York, NY 10038

The address designated by said attorney(s) for that purpose by depositing a true copy of same enclosed in a

postpaid, properly addressed wrapper, in an official depository under, the exclusive care and custody of the

United States Postal Service within the State of New York.

Date: 1/13/20

Allyson Keuvelaar
Real Estate Assistant
Shapiro, DiCaro & Barak, LLC
Attorneys for Plaintiff
175 Mile Crossing Boulevard
Rochester, New York 14624
Telephone: (585) 247-9000
Fax: (585) 247-7380

Sworn before me this 13th
day of January, 2020.

CHELSEA A. MATLOCK
Notary Public, State of New York
No. 01MA6342346
Qualified in Monroe County
Commission Expires May 23, 2020

Notary Public

# NOTICE OF SALE

SUPREME COURT COUNTY OF <u>NEW YORK</u>

U.S. Bank National Association (successor to Bank of America, N.A., successor by merger to LaSalle Bank N.A.), as Indenture Trustee, on behalf of the holders of the Thornburg Mortgage Securities Trust 2007-2 Mortgage-Backed Notes, Series 2007-2, Plaintiff

AGAINST

Bobby H.J. Kim; et al., Defendant(s)

Pursuant to a Judgment of Foreclosure and Sale duly dated May 29, 2018 I, the undersigned Referee will sell at public auction at the The Supreme Court, 60 Center Street, New York, NY on January 22, 2020 at 2:00PM, premises known as 130 Beekman Street 5b, New York, NY 10038. All that certain plot piece or parcel of land, with the buildings and improvements erected, situate, lying and being in the Borough of Manhattan, County, City and State of NY, Block 97 Lot 1118. Approximate amount of judgment $2,223,564.05 plus interest and costs. Premises will be sold subject to provisions of filed Judgment Index# 810144/12.

Alan M. Levin, Esq., Referee

Shapiro, DiCaro & Barak, LLC
Attorney(s) for the Plaintiff
175 Mile Crossing Boulevard
Rochester, New York 14624
(877) 430-4792

Dated: December 10, 2019

# Exhibit "C"

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------- X

IN RE

BOBBY H.J. KIM AKA BOBBY H. KIM, AKA
TITAN REAL ESTATE CAPITAL LLC, AKA
STAR BOUND INC.

CASE NO. 20-10149-cgm

DEBTOR

----------------------------------------------------- X

## RELIEF FROM STAY – REAL ESTATE AND COOPERATIVE APARTMENTS

I, **Ryan Stanger**     Document Control Officer

<NAME AND TITLE> OF
_Select Portfolio Servicing, Inc. as Servicer for  U.S. Bank National Association (successor to Bank of America, N.A., successor by merger to LaSalle Bank N.A.), as Indenture Trustee, on behalf of the holders of the Thornburg Mortgage Securities Trust 2007-2 Mortgage-Backed Notes, Series 2007-2_
(HEREINAFTER, "MOVANT"), HEREBY DECLARE (OR CERTIFY, VERIFY. OR STATE):

## BACKGROUND INFORMATION

1. REAL PROPERTY OR COOPERATIVE APARTMENT ADDRESS WHICH IS THE SUBJECT OF THIS

MOTION: _130 Beekman Street #5B, New York, NY 10038_

2. LENDER NAME: _Thornburg Mortgage Home Loans, Inc, A Delaware Corporation_

3. DATE OF MORTGAGE: _February 21, 2007_

4. POST-PETITION PAYMENT ADDRESS:
Select Portfolio Servicing, Inc., P.O. Box 65450, Salt Lake City, UT 84165-0450

## DEBT/VALUE REPRESENTATIONS

5. TOTAL PRE-PETITION AND POST-PETITION INDEBTEDNESS OF DEBTOR(S) TO MOVANT AT THE TIME OF FILING THE MOTION: $2,574,645.76 (as of 04/17/2020)
(Note: this amount may not to be relied on as a "payoff" quotation.)

6. MOVANT'S ESTIMATED MARKET VALUE OF THE REAL PROPERTY OR COOPERATIVE APARTMENT: $1,900,000.00

7. SOURCE OF ESTIMATED VALUATION:

BPO

## STATUS OF DEBT AS OF
## THE PETITION DATE

8. TOTAL PRE-PETITION INDEBTEDNESS OF DEBTOR(S) TO MOVANT AS OF PETITION FILING DATE:
$2,555,020.58

    A. AMOUNT OF PRINCIPAL: $1,599,860.77

    B. AMOUNT OF INTEREST: $742,872.65

    C. AMOUNT OF ESCROW (TAXES AND INSURANCE): $173,160.98

    D. AMOUNT OF FORCED PLACED INSURANCE EXPENDED BY MOVANT: $0.00

    E. AMOUNT OF ATTORNEYS' FEES BILLED TO DEBTOR(S) PRE-PETITION: $0.00

    F. AMOUNT OF PRE-PETITION LATE FEES, IF ANY, BILLED TO DEBTOR(S): $0.00

9. CONTRACTUAL INTEREST RATE: 3.875%

(If interest rate is (or was) adjustable, please list the rate(s) and date(s) the rate(s) was/were in effect on a separate sheet and attach the sheet as an exhibit to this form; please list the exhibit number here: N/A.)


10. PLEASE EXPLAIN ANY ADDITIONAL PRE-PETITION FEES, CHARGES OR AMOUNTS CHARGED TO DEBTOR'S/DEBTORS' ACCOUNT AND NOT LISTED ABOVE:

Fees & Costs Due (Lump Sum): $39,626.18
Suspense: ($500.00)

(If additional space is needed, please list the amounts on a separate sheet and attach the sheet as an exhibit to this form; please list the exhibit number here: N/A.)


## AMOUNT OF ALLEGED POST-PETITION DEFAULT
## (AS OF 04/17/2020)

11. DATE LAST PAYMENT WAS RECEIVED: N/A

12. ALLEGED TOTAL NUMBER OF PAYMENTS DUE POST-PETITION FROM FILING OF PETITION THROUGH PAYMENT DUE ON APRIL 1, 2020: 3.

13. PLEASE LIST ALL POST-PETITION PAYMENTS ALLEGED TO BE IN DEFAULT:

| ALLEGED PAYMENT DUE DATE | ALLEGED AMOUNT DUE | AMOUNT RECEIVED | AMOUNT APPLIED TO PRINCIPAL | AMOUNT APPLIED TO INTEREST | AMOUNT APPLIED TO ESCROW | LATE FEE CHARGED (IF ANY) |
|---|---|---|---|---|---|---|
| 2/1/20-3/1/20 | $11,998.75 per month | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| 4/1/20-4/1/20 | $12,180.57 per month | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| TOTALS | $ 36,178.07 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |

14. AMOUNT OF MOVANT'S ATTORNEYS' FEES BILLED TO DEBTOR FOR THE PREPARATION, FILING AND PROSECUTION OF THIS MOTION: $0.00

15. AMOUNT OF MOVANT'S FILING FEE FOR THIS MOTION: $0.00

16. OTHER ATTORNEYS' FEES BILLED TO DEBTOR POST-PETITION: $0.00

17. AMOUNT OF MOVANT'S POST-PETITION- INSPECTION FEES: $0.00

18. AMOUNT OF MOVANT'S POST-PETITION APPRAISAL/BROKER'S PRICE OPINION: $0.00

19. AMOUNT OF FORCED PLACED INSURANCE OR INSURANCE PROVIDED BY THE MOVANT POST-PETITION: $0.00

20. SUM HELD IN SUSPENSE BY MOVANT IN CONNECTION WITH THIS CONTRACT, IF APPLICABLE: $0.00

21. AMOUNT OF OTHER POST-PETITION ADVANCES OR CHARGES, FOR EXAMPLE TAXES, INSURANCE INCURRED BY DEBTOR, ETC.: N/A

## REQUIRED ATTACHMENTS TO MOTION

Please attach the following documents to this motion and indicate the exhibit number associated with the documents.

(1)     Copies of documents that indicate Movant's interest in the subject property. For purposes of example only, a complete and legible copy of the promissory note or other debt instrument together with a complete and legible copy of the mortgage and any assignments in the chain from the original mortgagee to the current moving party. (Exhibit A.)

(2)     Copies of documents establishing proof of standing to bring this Motion. (Exhibit A.)

(3)     Copies of documents establishing that Movant's interest in the real property or

cooperative apartment was perfected. For the purposes of example only, a complete and legible copy of the Financing Statement (UCC-1) filed with either the Clerk's Office or the Register of the county the property or cooperative apartment is located in. (Exhibit N/A.)

05/27/2020

**Ryan Stanger**
Document Control Officer
Select Portfolio Servicing, Inc.

3217 S. Decker Lake Dr.
Salt Lake City, UT 84119

# CERTIFICATION FOR BUSINESS RECORDS

I CERTIFY THAT THE INFORMATION PROVIDED IN THIS FORM AND/OR ANY EXHIBITS ATTACHED TO THIS FORM (OTHER THAN THE TRANSACTIONAL DOCUMENTS ATTACHED AS REQUIRED BY PARAGRAPHS 1, 2 AND 3, IMMEDIATELY ABOVE) IS DERIVED FROM RECORDS THAT WERE MADE AT OR NEAR THE TIME OF THE OCCURRENCE OF THE MATTERS SET FORTH BY, OR FROM INFORMATION TRANSMITTED BY, A PERSON WITH KNOWLEDGE OF THOSE MATTERS, WERE KEPT IN THE COURSE OF THE REGULARLY CONDUCTED ACTIVITY; AND WERE MADE BY THE REGULARLY CONDUCTED ACTIVITY AS A REGULAR PRACTICE.

I FURTHER CERTIFY THAT COPIES OF ANY TRANSACTIONAL DOCUMENTS ATTACHED TO THIS FORM AS REQUIRED BY PARAGRAPHS 1, 2 AND 3, IMMEDIATELY ABOVE, ARE TRUE AND ACCURATE COPIES OF THE ORIGINAL DOCUMENTS. I FURTHER CERTIFY THAT THE ORIGINAL DOCUMENTS ARE IN MOVANT'S POSSESSION, EXCEPT AS FOLLOWS: N/A

## DECLARATION

I, **Ryan Stanger**          Document Control Officer

<NAME AND TITLE> OF
SELECT PORTFOLIO SERVICING, INC. AS SERVICER FOR U.S. BANK NATIONAL ASSOCIATION (SUCCESSOR TO BANK OF AMERICA, N.A., SUCCESSOR BY MERGER TO LASALLE BANK N.A.), AS INDENTURE TRUSTEE, ON BEHALF OF THE HOLDERS OF THE THORNBURG MORTGAGE SECURITIES TRUST 2007-2 MORTGAGE-BACKED NOTES, SERIES 2007-2 HEREBY DECLARE (OR CERTIFY, VERIFY, OR STATE) PURSUANT TO 28 U.S.C. SECTION 1746 UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT BASED ON PERSONAL KNOWLEDGE OF THE MOVANT'S BOOKS AND BUSINESS RECORDS.

EXECUTED AT Salt Lake City          , Utah          ON THIS 27th DAY OF May          , 2020.

**Ryan Stanger** 05/27/2020

Print Name

Document Control Officer

Title

Select Portfolio Servicing, Inc. as servicer for U.S. Bank National Association (successor to Bank of America, N.A., successor by merger to LaSalle Bank N.A.), as Indenture Trustee, on behalf of the holders of the Thornburg Mortgage Securities Trust 2007-2 Mortgage-Backed Notes, Series 2007-2
3217 S. Decker Lake Dr.
Salt Lake City, UT 84119

# Exhibit "D"



www.RRReview.com
866-876-5095

| Account # |  | Order # |  |
|---|---|---|---|
| Client | Select Portfolio Servicing, Inc. | Group ID | U50 |
| Inspection | Exterior | Occupancy | Occupied |
| Effective Date | 03/19/2020 | County | New York |
| Owner | BOBBY KIM | Parcel # |  |
| Address | 130 BEEKMAN STREET 5B NEW YORK NY 10038 |  |  |
| Correction |  |  |  |

## General Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Type | Condo | Housing Inventory | Stable | Tax Assessed Value | $160,862 | Neighborhood Low | $1,650,000 |
| Location | Urban | Property Values | Stable | Annual Property Tax | $20,288 | Neighborhood High | $2,095,000 |
| Ownership Type | Fee-simple | Land Value | $38,599 | Neighborhood Predominant | $1,872,500 | Typical/Distressed Marketing | 120 / 30 days |

## Listing and Sale Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Currently Listed | No | Current List Price | - | Last Sale Price | - | Prev. List (12 Mos.) | No |
| Listing Date | - | Original List Price | - | Last Sale Date | - | Prev. Sale (36 Mos.) | No |
| Subject Comments | There are 0 ECB violations. There are 0 DOB violations. There are 0 HPD violations. Zoning: Condo. Property Type: Vendor agree (See Addendum) | | | | | | |

## Comparable Information

| | Subject | Sale 1 | Sale 2 | Sale 3 | Listing 1 | Listing 2 | Listing 3 |
|---|---|---|---|---|---|---|---|
| Address | 130 BEEKMAN STREET 5B , 10038 | 99 JOHN STREET #1903 , 10038 | 150 NASSAU STREET 14A , 10038 | 15 BROAD STREET 2300 , 10038 | 15 BROAD STREET #2112 , 10038 | 215 BOWERY #4R , 10038 | 59 JOHN STREET #4C , 10038 |
| Proximity | - | 0.18 Miles | 0.33 Miles | 0.41 Miles | 0.43 Miles | 1.10 Miles | 0.26 Miles |
| DataSource | Tax Records | MLS:89332089 | MLS:63863459 | MLS:80004866 | MLS:80004278 | MLS:31496368 | MLS:5945104 |
| HOA | $805 | $810 | $898 | $972 | $904 | $500 | $825 |
| Fair Market Rent | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 | $1,800 |
| Sale Type | - | Arms Length | Arms Length | Arms Length | Arms Length | Arms Length | Arms Length |
| Orig List Price | - | $1,750,000 | $1,900,000 | $1,995,000 | $1,890,000 | $1,945,000 | $1,995,000 |
| Current List Price | - | - | - | - | $1,890,000 | $1,945,000 | $1,995,000 |
| Orig List Date | - | 12/21/2019 | 12/19/2019 | 08/19/2019 | 02/03/2020 | 02/24/2020 | 01/06/2020 |
| Sale Price | - | $1,750,000 | $1,900,000 | $1,995,000 | - | - | - |
| Concessions | - | $0 | $0 | $0 | - | - | - |
| Sale Date | - | 03/05/2020 | 02/26/2020 | 10/31/2019 | - | - | - |
| Financing | - | FHA | FHA | FHA | - | - | - |
| DOM | - | 75 | 69 | 73 | 49 | 28 | 77 |
| # of Units | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Style | Condo Mid-rise | Condo Mid-rise | Condo Mid-rise | Condo Mid-rise | Condo Mid-rise | Condo Mid-rise | Condo Mid-rise |
| Lot Size | 0.01 acres | 0.01 acres | 0.01 acres | 0.01 acres | 0.01 acres | 0.01 acres | 0.01 acres |
| View | Water | Neighborhood | Neighborhood | Neighborhood | Neighborhood | Neighborhood | Neighborhood |
| Condition | Average | Average | Average | Average | Average | Average | Average |
| Year Built | 2003 | 1900 | 1914 | 1914 | 1900 | 1909 |  |
| Total Room Count | Rms/Bds/Full/Half 8/3/3/0 | Rms/Bds/Full/Half 6/2/2/0 | Rms/Bds/Full/Half 5/2/1/0 | Rms/Bds/Full/Half 8/3/3/0 | Rms/Bds/Full/Half 5/1/2/0 | Rms/Bds/Full/Half 4/1/1/0 | Rms/Bds/Full/Half 7/2/2/1 |
| Above Grade Sq Ft | 1610 | 1620 | 1797 | 1945 | 1809 | 1000 | 1651 |
| Basement SF | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| % Basement Finish | - | - | - | - | - | - | - |
| Garage/Carport | 0 None | 0 None | 0 None | 0 None | 0 None | 0 None | 0 None |
| Pool/Spa | No | No | No | No | No | No | No |
| Amenities | - | - | - | - | - | - | - |
| Best Sale/List | | | X | | | | X |
| Adjustment for Differences | - | -$900 | $24,390 | -$12,850 | $21,230 | $58,300 | $11,970 |
| Adjusted Price | - | $1,749,100 | $1,924,390 | $1,982,150 | $1,911,230 | $2,003,300 | $2,006,970 |
| SP / GLA Per SF | $1,180.12 | $1,080.25 | $1,057.32 | $1,025.71 | $1,044.78 | $1,945.00 | $1,208.36 |

## Comparable Comments (See Page 3)

## Marketing Strategy

| | | | |
|---|---|---|---|
| 30 Day As Is | $1,750,000 | 30 Day Repaired | $1,750,000 |
| 90 - 120 Days "As Is" | $1,900,000 | 90 - 120 Days "Repaired" | $1,900,000 |
| As-Is List Price | $1,950,000 | Repaired List Price | $1,950,000 |
| Estimated Repairs | $0 | (See following page for repair details) | |

## Subject & Neighborhood Information

| | | | | | |
|---|---|---|---|---|---|
| Zoning: | Condo | Current Use: | Condo | HOA Fee: | $805 |
| Zoning Code: | AE | Projected Use: | Condo | HOA Amenities: | Water, Trash, Maintenance, Snow Removal |

| | |
|---|---|
| Neighborhood Comment | Subject is located in New York City, the most populous city in the United States and location is considered urban. The subject is located in an established neighborhood that consists of mostly homes displaying general similarity in design, appeal and size. Estimated % of REO Homes: 1%-10%. |
| Environmental Issues | No |
| Functional or Economic Obsolescence | No |
| Positive / Negative Features | None |
| Sewer | Public |
| Water | Public |

## Repairs – Exterior

| Item | Description | Estimated Cost |
|---|---|---|
| 1. Exterior Finish | - | $0 |
| 2. Painting | - | $0 |
| 3. Windows | - | $0 |
| 4. Roof | - | $0 |
| 5. Structural | - | $0 |
| 6. Landscaping | - | $0 |
| 7. Outbuildings | - | $0 |
| 8. Debris Removal | - | $0 |
| 9. Utility | - | $0 |
| 10. Other | - | $0 |
| **Grand Total for Cost of Repairs** | | **$0** |

## Quality Control Review

| Item | Quick Sale | 90 - 120 Day |
|---|---|---|
| Field "As Is" Price | $1,750,000 | $1,900,000 |
| "As Is" Price Adjusted by Quality Control | $0 | $0 |
| Field "Repaired" Price | $1,750,000 | $1,900,000 |
| "Repaired" Price Adjusted by Quality Control | $0 | $0 |

### Quality Control Comment

Passed QC Review

### Map Comments

This report has passed a manual Map QC review

## Purpose

The purpose of this analysis is to provide a probable sale price of the subject property. This analysis is not to be used in lieu of an appraisal for the purpose of determining whether to approve a mortgage loan. Nothing in this report should be construed as a guarantee of value or condition of the subject property. This analysis is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practices. This report is for the internal use of the name client listed above, and is to assist with mortgage due diligence and internal decision-making processes. It will not be used for loan origination.

# Addendum

1. **Subject Comments** - There are 0 ECB violations. There are 0 DOB violations. There are 0 HPD violations. Zoning: Condo.
Property Type: Vendor agrees with the provided property characteristics.
# of Units: Vendor agrees with the provided property characteristics.
Lot Size (Ac.): Vendor agrees with the provided property characteristics.
Year Built: Vendor agrees with the provided property characteristics.
Room Count: Vendor agrees with the provided property characteristics.
Bed Count: Vendor agrees with the provided property characteristics.
Bath Count: Vendor agrees with the provided property characteristics.
Living Sq.Ft.: Vendor agrees with the provided property characteristics.
Basement (Y/N): Vendor agrees with the provided property characteristics.

2. **Sale 1 Comments** - Similar: Unit 1903 is a modern, spacious and beautifully-renovated 2 bedroom, 2 bathroom residence. It has been freshly painted and professionally cleaned for a quick move-in. No Fee and No Hassel! It is a high-floor, corner unit with tall ceilings and large windows to boast southern and western exposures which lend-in bright natural light. ADJUSTMENTS: # of Units: $0 Style: $0 Lot Size: $0 View: $0 Condition: $0 Year Built: -$20,600 Beds: $10,000 Full Baths: $10,000 Half Baths: $0 Above Grade Sq Ft: -$300 Basement Sq Ft: $0 Garage/Carport: $0 # of Cars: $0 Pool/Spa: $0 Amenities: $0 Miscellaneous: $0

3. **Sale 2 Comments** - Similar: Residence 14A at 150 Nassau Street is a newly two bedroom, two-and-a-half bathroom pre-war condo. Spanning 1,797 square feet this state of the art loft presents a move-in ready opportunity at the landmarked American Tract Society Building near City Hall Park. ADJUSTMENTS: # of Units: $0 Style: $0 Lot Size: $0 View: $0 Condition: $0 Year Built: $0 Beds: $10,000 Full Baths: $20,000 Half Baths: $0 Above Grade Sq Ft: -$5,610 Basement Sq Ft: $0 Garage/Carport: $0 # of Cars: $0 Pool/Spa: $0 Amenities: $0 Miscellaneous: $0

4. **Sale 3 Comments** - Similar: THE APARTMENT: Bright, spacious, airy and open, Apartment 2300 is a gem. Nestled in the heart of the revitalized and highly sought after Financial District neighborhood, this two bedroom, two bathroom corner home is warm and welcoming. ADJUSTMENTS: # of Units: $0 Style: $0 Lot Size: $0 View: $0 Condition: $0 Year Built: -$2,800 Beds: $0 Full Baths: $0 Half Baths: $0 Above Grade Sq Ft: -$10,050 Basement Sq Ft: $0 Garage/Carport: $0 # of Cars: $0 Pool/Spa: $0 Amenities: $0 Miscellaneous: $0

5. **Listing 1 Comments** - Similar: VOLUME, SCALE AND AMENITIES AT 15 BROAD At just over 1,800 square feet with 11' ceilings, Loft 2112 offers an incredible flex two-bedroom/two-bathroom home with extraordinary volume and scale. From the oversized windows--through which the western light floods in--to the substantial 55' x 18' grand room and re-imagined pre-war detailing, this loft is a perfect study in proportion and design. ADJUSTMENTS: # of Units: $0 Style: $0 Lot Size: $0 View: $0 Condition: $0 Year Built: -$2,800 Beds: $20,000 Full Baths: $10,000 Half Baths: $0 Above Grade Sq Ft: -$5,970 Basement Sq Ft: $0 Garage/Carport: $0 # of Cars: $0 Pool/Spa: $0 Amenities: $0 Miscellaneous: $0

6. **Listing 2 Comments** - Similar: This designer renovated corner pre-war condo loft with southern exposure, industrial character and clear views will astound you with its sheer volume of space. Expertly designed by Fernando Santangelo, whose work appears frequently in the pages of World of Interiors, Architectural Digest, Elle Decor and The New York Times Magazine. The open concept living space spans 35' and is hallmarked by iconic loft trademarks, 12' high ceilings. ADJUSTMENTS: # of Units: $0 Style: $0 Lot Size: $0 View: $0 Condition: $0 Year Built: $0 Beds: $20,000 Full Baths: $20,000 Half Baths: $0 Above Grade Sq Ft: $18,300 Basement Sq Ft: $0 Garage/Carport: $0 # of Cars: $0 Pool/Spa: $0 Amenities: $0 Miscellaneous: $0

7. **Listing 3 Comments** - Similar: Rarely Available! This sprawling 1,651 SF corner condo at 59 John Street, residence 4-C defines luxury. It features 2 spacious bedrooms (originally a 3 bedroom layout) and 2.5 spa-like baths. Enormous south and east facing windows throughout the apartment, 11' high ceilings, upgraded wide plank, white oak floors, custom built-ins, and automatic shades, surround sound system and high-end finishes make this home truly a rare find. ADJUSTMENTS: # of Units: $0 Style: $0 Lot Size: $0 View: $0 Condition: $0 Year Built: -$1,800 Beds: $10,000 Full Baths: $10,000 Half Baths: -$5,000 Above Grade Sq Ft: -$1,230 Basement Sq Ft: $0 Garage/Carport: $0 # of Cars: $0 Pool/Spa: $0 Amenities: $0 Miscellaneous: $0

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS: This report is subject to following assumptions and limiting conditions:
1. Assumes that the title is good and marketable and will not render any opinions about the title.
2. Assumes both tax and MLS data is current and accurate.
3. The preparer is not a surveyor, he or she makes no guarantees, express or implied, regarding accuracy of the properties boundaries, nor any special designations, such as Special Flood Hazard Areas.
4. For exterior inspections, the agent has investigated all resources available such as MLS, public records, online data, prior inspections,and information provided by the client to identify the physical characteristics, which includes the interior condition, of the subject property. If reliable information is discovered about the interior condition that is or is not consistent with the exterior condition, then the agent has incorporated that information into their report. Otherwise, the agent has made an assumption that the interior condition of the property is consistent with the observed exterior condition.
5. The report notes any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she become aware of during the research involved in performing this report. Unless otherwise stated in this report, there is no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, need repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The preparer will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the preparer is not an expert in the field of environmental hazards, this report must not be considered as as environmental assessment of the property.
6. The as "Repaired" conclusion is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

This document was created by an independent agent for RRReview. The following methodology was used with consideration for RRReview policies and any specific client requirements.
**Data Collection:** Public and/or private data was collected and analyzed, including but not limited to all available tax documentation and MLS data, to determine neighborhood characteristics, local market conditions, use, zoning, tax assessments, physical characteristics, transaction history and past or current listing information. Information was then gathered on six other properties that are comparable to the subject property in location, use and dominant features: three that have been recently sold and three that are currently listed for sale.
**Site Inspection:** Per the client instructions, the subject property and surrounding neighborhood were inspected and photographed. This inspection may have been of the interior and/or exterior based on the inspection type. The inspection included a review for the condition of the dwelling, improvements, and any other positive or negative features. Any known environmental issues or functional or economic obsolescence are also taken into consideration.
**Reconciliation:** The collected data was then compiled with information collected from the site inspection and compared to the information from the selected comparables. The properties were compared to the subject using the sales comparison approach, which is primarily based upon the principle of substitution. The property condition, market conditions and any other noted positive or negative influences were also considered. The analysis resulted as a single figure or a range of values, as ordered by the client.
**Reporting:** The summary of the results and the data collection, site inspection and reconciliation were provided on the appropriate report form as ordered by the client.

Please note: Certain state and federal laws may prohibit and/or restrict a real estate licensee who estimates the price/value of real property or may restrict the types of transactions for which the real estate licensee's report can be used. You may wish to confirm with your legal advisor to ensure that this report is used for an appropriate purpose, as set forth in applicable state and federal law.
Certifications:
The agent and/or broker has certified that they are covered by errors and omissions insurance, to the extent required by state law, for all liability associated with the preparation of this report.
The agent and/or broker who executed this report has no existing or contemplated interest in the subject property.

**Subject Property Front View - 130 BEEKMAN STREET 5B , 10038**

**Subject Address Verification**



**Subject Street Scene**



**Sale 1 Photo - 99 John Street #1903, 10038** $1,750,00 0



**Sale 2 Photo - 150 NASSAU STREET 14A, 10038** $1,900,00 0

**Sale 3 Photo - 15 BROAD STREET 2300, 10038** $1,995,00 0



Subject Property Front View - 130 BEEKMAN STREET 5B , 10038

Subject Address Verification

| **Listing 1 Photo - 15 Broad Street #2112, 10038** | **$1,890,000** |
|---|---|



| **Listing 2 Photo - 215 Bowery #4R, 10038** | **$1,945,000** |
|---|---|

| **Listing 3 Photo - 59 John Street #4C, 10038** | **$1,995,000** |
|---|---|

## Comparable Data Map



| Legend | Property | Distance | Street |
|---|---|---|---|
| X | **Subject** | **0 Miles** | **130 BEEKMAN STREET 5B , 10038** |
| 1 | Sale 1 | 0.18 Miles | 99 John Street #1903, 10038 |
| 2 | Sale 2 | 0.33 Miles | 150 NASSAU STREET 14A, 10038 |
| 3 | Sale 3 | 0.41 Miles | 15 BROAD STREET 2300, 10038 |
| 4 | Listing 1 | 0.43 Miles | 15 Broad Street #2112, 10038 |
| 5 | Listing 2 | 1.10 Miles | 215 Bowery #4R, 10038 |
| 6 | Listing 3 | 0.26 Miles | 59 John Street #4C, 10038 |

## Agent Information

| | |
|---|---|
| Prepared By Agent: Colin Colebrook | Agent Phone: (347) 278-2793 |
| Agent Email: ████████████ | License Number: ████████ |
| Broker: Colin Colebrook | Expiration Date: 10/3/2021 |
| Distance to Subject: 7.93 miles | Years Experience: 3 |
| Electronically Signed: 3/23/2020 9:24:00 AM | |

## Legal Disclaimer

Notwithstanding any preprinted language to the contrary, this opinion is not an appraisal of market value of the subject property. If an appraisal is desired, the services of a licensed or certified appraiser must be obtained.

© 2010 Residential RealEstate Review, all rights reserved.